No. 22-12966

## IN THE
# United States Court of Appeals
## FOR THE ELEVENTH CIRCUIT

ODETTE BLANCO DE FERNANDEZ, A.K.A. BLANCO ROSELL, EMMA RUTH BLANCO, IN HER PERSONAL CAPACITY, AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ALFREDO BLANCO ROSELL, JR., HEBE BLANCO MIYARES, IN HER PERSONAL CAPACITY, AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BYRON BLANCO ROSELL, SERGIO BLANCO DE LA TORRE, IN HIS PERSONAL CAPACITY, AND AS ADMINISTRATOR AD LITEM OF THE ESTATE OF ENRIQUE BLANCO ROSELL, EDUARDO BLANCO DE LA TORRE, AS ADMINISTRATOR AD LITEM OF THE ESTATE OF FLORENTINO BLANCO ROSELL, LIANA MARIA BLANCO, SUSANNAH VALENTINA BLANCO, LYDIA BLANCO BONAFONTE, JACQUELINE M. DELGADO, BYRON DIAZ BLANCO, JR., MAGDELENA BLANCO MONTOTO, FLORENTINO BLANCO DE LA TORRE, JOSEPH E. BUSHMAN, CARLOS BLANCO DE LA TORRE, GUILLERMO BLANCO DE LA TORRE,

*Plaintiffs-Appellants*,

v.

SEABOARD MARINE LTD.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Florida, No. 20-cv-25176

## OPENING BRIEF FOR APPELLANTS

David A. Baron
Melvin White
BERLINER CORCORAN & ROWE, LLP
1101 17th Street, N.W., Ste. 1100
Washington, D.C. 20036
(202) 293-1074

Eugene A. Sokoloff
*Counsel of Record*
Kenneth E. Notter III
MOLOLAMKEN LLP
300 N. LaSalle Street
Chicago, IL 60654
(312) 639-8410
esokoloff@mololamken.com

*Counsel for Appellants*
*(Additional counsel listed on inside cover)*

Laina C. Lopez
Dale B. Eppler
Jared R. Butcher
BERLINER CORCORAN & ROWE, LLP
1101 17th Street, N.W., Ste. 1100
Washington, D.C.  20036
(202) 293-9096


John S. Gaebe
LAW OFFICES OF JOHN S. GAEBE P.A.
5870 SW 96 St.
Miami, Florida  33156
(305) 607-4755

Martin Cunniff
FIELDS PLLC
1701 Pennsylvania Ave, N.W., Ste. 200
Washington, D.C.  20006
(833) 382-9816


William R. Boeringer
William B. Milliken
HORR, NOVAK & SKIPP, P.A.
Two Datran Center, Ste. 1700
9130 S. Dadeland Boulevard
Miami, Florida  33156
(305) 670-2525

*Counsel for Appellants*

*De Fernandez et al. v. Seaboard Marine Ltd.*, No. 22-12966

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Appellants Odette Blanco de Fernandez, *nee* Blanco Rosell, *et al.*, file this Certificate of Interested Persons and Corporate Disclosure Statement, listing in alphabetical order the parties and entities interested in this appeal, as required by Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1.  Identifiable interested parties to the action are as follows:

- Baron, David A., Attorney for Appellants
- Berliner Corcoran & Rowe, LLP, Attorneys for Appellants
- Blanco Bonafonte, Lydia, Appellant
- Blanco de Fernandez, Odette (*nee* Blanco Rosell), Appellant
- Blanco de la Torre, Carlos, Appellant
- Blanco de la Torre, Eduardo, Appellant
- Blanco de la Torre, Florentino, Appellant
- Blanco de la Torre, Guillermo, Appellant
- Blanco de la Torre, Sergio, Appellant
- Blanco Miyares, Hebe, Appellant
- Blanco Montoto, Magdalena, Appellant

*De Fernandez et al. v. Seaboard Marine Ltd.*, No. 22-12966

- Blanco Rosell, Alfredo Jr., Estate of

- Blanco Rosell, Byron, Estate of

- Blanco Rosell, Florentino, Estate of

- Blanco, Byron Jr., Appellant

- Blanco, Emma Ruth, Appellant

- Blanco, Liana Maria, Appellant

- Blanco, Susannah Valentina, Appellant

- Bloom, Beth, U.S. District Court Judge, Southern

  District of Florida

- Boeringer, William R., Attorney for Appellants

- Brochin, Robert M., Attorney for Appellees

- Bushman, Joseph E., Appellant

- Butcher, Jared, R., Attorney for Appellants

- Cunniff, Martin, Attorney for Appellants

- Delgado, Jacqueline, Appellant

- Fields PLLC, Attorneys for Appellants

- Fields, Richard W., Attorney for Appellants

- Gaebe, John S., Attorney for Appellants

- Horr, David J., Attorney for Appellants

*De Fernandez et al. v. Seaboard Marine Ltd.*, No. 22-12966

- Horr, Novak & Skipp, P.A., Attorneys for Appellants

- Law Offices of John S. Gaebe, P.A., Attorneys for
  Appellants

- Lopez, Laina C., Attorney for Appellants

- Milliken, William B., Attorney for Appellants

- MoloLamken LLP, Attorneys for Appellants

- Morgan, Lewis & Bockius, LLP, Attorneys for
  Appellees

- Notter III, Kenneth E., Attorney for Appellant

- Papkin, Matthew, Attorney for Appellees

- Seaboard Corporation of Delaware (SEB), Appellees'
  Parent Company

- Seaboard Marine, Ltd., Inc., Appellees

- Sokoloff, Eugene A., Attorney for Appellants

- Valenstein, Carl A., Attorney for Appellees

- White, Melvin, Attorney for Appellants

Appellants are not corporations, and thus, they have no parent corporations, nor does any publicly traded corporation own 10% or more of their stock. Appellees' parent company, Seaboard Corporation of Delaware, is publicly traded on the New

*De Fernandez et al. v. Seaboard Marine Ltd.*, No. 22-12966

York Stock Exchange Market (also known as "NYSE MKT" and formerly known

as "AMEX") as SEB.


Dated: November 16, 2022                    */s/* Eugene A. Sokoloff
                                            Eugene A. Sokoloff

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is necessary and will assist the Court in resolving this appeal, which raises important questions of first impression regarding the scope of the private right of action Congress created under the Helms-Burton Act for victims of the Castro regime.

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ...........................................................4

ISSUES PRESENTED...............................................................................4

STATEMENT OF THE CASE...................................................................5

      A.    The Blanco Rosell Siblings' Property in Mariel Bay, Cuba ................5

             1.    Azucarera's Landholdings Around Mariel Bay .........................6

             2.    Maritima's Concession to Operate Mariel Bay's Port Facilities ....................................................................................7

      B.    Castro's Regime Confiscates the Blanco Rosell Siblings' Property....................................................................9

      C.    Congress Enacts the Helms-Burton Act to Compensate Victims of the Regime's Confiscations .............................................10

      D.    Seaboard Traffics in the Blanco Rosell Siblings' Property ...............12

      E.    Proceedings in the District Court .......................................................13

             1.    The District Court's Motion-to-Dismiss Ruling.......................14

             2.    The District Court's Summary Judgment Ruling .....................15

SUMMARY OF ARGUMENT.................................................................18

ARGUMENT ..........................................................................................21

I.    Seaboard Trafficked in Maritima Mariel's Exclusive Right to Exploit Port Facilities in Mariel Bay.........................................................................21

      A.    The 1955 Decree Conferred Rights Over the Whole of Mariel Bay.............................................................................23

ii

1.  The Concession Covered the Whole Bay ................................24

2.  The Concession Was Prospectively Exclusive ........................26

3.  The Concession's Conditions Confirm its Breadth .................27

B.  The District Court's Contrary Reading Cannot Be Reconciled With the Decree's Plain Language .......................................................29

II.  Seaboard Trafficked in Azucarera Mariel's Land .........................................32

A.  Seaboard Trafficked in Azucarera's Property Because the Container Terminal it Used is Built Partly on Confiscated Land .......34

1.  Seaboard's Business Benefited from Azucarera's Property ...............................................................................35

2.  There Was No Record or Legal Basis for the District Court to Subdivide the Terminal ................................37

3.  The District Court's Analysis Fails on its Own Terms Because TCM's Office is on Confiscated land ........................40

B.  Seaboard Trafficked in Azucarera's Property Because it Contracted With Traffickers ................................................44

III.  Title III's Bar Date Does Not Apply to Rights Subject to Probate or to Rights Passed by Inheritance .......................................................48

A.  The Late Blanco Rosell Siblings' Estates Did Not "Acquire" the Siblings' Claims ...........................................................49

1.  Under Florida Law, an Estate Does Not "Acquire" Property in the Sense that Term is Used in the Helms-Burton Act ...............................................................................50

2.  The District Court Misconstrued Florida Estate Law ..............52

B.  Alternatively, the Heirs of the Late Blanco Rosell Siblings May Sue ......................................................................53

C.    Barring the Claims of Estates and Heirs Would Undercut Title
III's Purpose and Raise Serious Separation-of-Powers Concerns ......54

CONCLUSION ......................................................................................................55

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## CASES

*Am. Nat'l Bank of Jacksonville v. F.D.I.C.*,
  710 F.2d 1528 (11th Cir. 1983) ............................................................18, 30, 31

*Appleby v. Delaney*,
  271 U.S. 403 (1926)......................................................................................27

*Barnhill v. Johnson*,
  503 U.S. 393 (1992)......................................................................................50

*In re Binghamton Bridge*,
  70 U.S. (3 Wall.) 51 (1865) ..........................................................................27

*Brady v. Carnival Corp.*,
  33 F.4th 1278 (11th Cir. 2022) ................................................................34, 47

*Chapman v. Am. Cyanamid Co.*,
  861 F.2d 1515 (11th Cir. 1988) ....................................................................42

*In re Cumbess*,
  960 F.3d 1325 (11th Cir. 2020) ....................................................................25

*Depriest v. Greeson*,
  213 So. 3d 1022 (Fla. Dist. Ct. App. 2017)..............................................52, 53

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)......................................................................................31

*In re Estate of Slater*,
  437 So. 2d 1110 (Fla. Dist. Ct. App. 1983)...................................................51

*Ferguson v. Destefano*,
  No. 10-cv-80385, 2010 WL 11561136 (S.D. Fla. Oct. 6, 2010)......................43

*Gonzalez v. Amazon.com, Inc.*,
  835 F. App'x 1011 (11th Cir. 2021) ..............................................................15

*Havana Docks Corp. v. Carnival Corp.*,
     ___ F. Supp. 3d ____, 2022 WL 831160 (S.D. Fla. 2022)...........................44, 45

*Hawaii v. Off. of Hawaiian Affs.*,
     556 U.S. 163 (2009)........................................................................................31

*Hegel v. First Liberty Ins. Corp.*,
     778 F.3d 1214 (11th Cir. 2015) .....................................................................23

*Internaves de Mexico s.a. de C.V. v. Andromeda Steamship Corp.*,
     898 F.3d 1087 (11th Cir. 2018) .....................................................................23

*Johnson v. White*,
     989 F.3d 913 (11th Cir. 2021) .......................................................................37

*Magwood v. Tate*,
     835 So. 2d 1241 (Fla. Dist. Ct. App. 2003)...................................................49

*Manners v. Cannella*,
     891 F.3d 959 (11th Cir. 2018) .......................................................................42

*Murr v. Wisconsin*,
     137 S. Ct. 1933 (2017)..............................................................................39, 40

*Pahls v. Thomas*,
     718 F.3d 1210 (10th Cir. 2013) .....................................................................43

*Peery v. City of Miami*,
     977 F.3d 1061 (11th Cir. 2020) .....................................................................30

*\*Sharps v. Sharps*,
     214 So. 2d 492 (Fla. Dist. Ct. App. 1968).....................................................52

*Spencer v. Specialty Foundry Prods. Inc.*,
     953 F.3d 735 (11th Cir. 2020) .......................................................................50

*State v. Lahurd*,
     632 So. 2d 1101 (Fla. Dist. Ct. App. 1994)...................................................51

*\*Sullivan v. Sessions*,
     80 So. 2d 706 (Fla. 1955) ..................................................................21, 49, 51

*Todd v. Carstarphen*,
  236 F. Supp. 3d 1311 (N.D. Ga. 2017)..................................................43

*United States v. Bryant*,
  996 F.3d 1243 (11th Cir. 2021) ............................................................31

*United States v. Burroughs*,
  810 F.3d 833 (D.C. Cir. 2016)..............................................................43

*United States v. F.E.B. Corp.*,
  __ F.4th __, 2022 WL 16557827 (11th Cir. 2022)...........................17

*United States v. Julius*,
  14 F.4th 752 (7th Cir. 2021) .................................................................43

*United States v. Lamons*,
  532 F.3d 1251 (11th Cir. 2008) ............................................................43

*United States v. Lizarraga-Tirado*,
  789 F.3d 1107 (9th Cir. 2015) ..............................................................43

*United States v. Pemco Aeroplex, Inc.*,
  195 F.3d 1234 (11th Cir. 1999) ......................................................34, 49

*United States v. Perea-Rey*,
  680 F.3d 1179 (9th Cir. 2012) ..............................................................43

*United States v. Vega-Rivera*,
  866 F.3d 14 (1st Cir. 2017).................................................................43

*In re Walter Energy, Inc.*,
  911 F.3d 1121 (11th Cir. 2018) ............................................................50

*Yazoo & Mississippi Valley R. Co. v. Thomas*,
  132 U.S. 174 (1889)..............................................................................31

## STATUTES AND RULES

22 U.S.C. § 6021(1) ..........................................................................10, 11

22 U.S.C. § 6023(3) ................................................................................36

*22 U.S.C. § 6023 (13)(A) ........................................................... 1, 11

22 U.S.C. § 6023 (13)(A)(i) .......................................................... 37, 44

22 U.S.C. § 6023 (13)(A)(ii) ........................................................ *passim*

22 U.S.C. § 6023 (13)(A)(iii) ..................................... 20, 33, 44, 45, 46

22 U.S.C. § 6064 (a) ................................................................. 12, 54, 55

22 U.S.C. § 6081 (6) ..................................................................... 10, 11

22 U.S.C. § 6081 (8) ........................................................................... 54

22 U.S.C. § 6081 (11) ......................................................................... 54

22 U.S.C. § 6082 (a)(1) ................................................................. 1, 11

22 U.S.C. § 6082 (a)(4)(B) ........................................................ 12, 14, 48

22 U.S.C. § 6082 (h)(1)(B) ................................................................. 55

22 U.S.C. § 6084 .............................................................................. 12

22 U.S.C. § 6085 (c)(1)(B) ......................................................... 12, 54

28 U.S.C. § 1291 ................................................................................ 4

28 U.S.C. § 1331 ................................................................................ 4

28 U.S.C. § 1603 (d) ..................................................................... 35, 36

Fed. R. Evid. 201 (f) .................................................................... 20, 43

Fla. Stat. § 731.201 (14) ...................................................... 15, 51, 52, 53

Fla. Stat. § 731.201 (32) ..................................................................... 51

Fla. Stat. § 733.607 (1) ...................................................................... 51

## OTHER AUTHORITIES

17A Am. Jur. 2d Contracts ................................................................. 31

Black's Law Dictionary (6th ed. 1990) ...................................................................50

Google Earth, *available at* https://earth.google.com ...............................................10

H.R. Rep. No. 104-202 (1995)....................................................................11, 48, 54

Oxford English Dictionary (2d ed. 1989) ................................................................50

TC Mariel, *available at* https://www.tcmariel.cu/?lang=en .............................10, 44

U.S. Department of State, *Secretary of State Michael R. Pompeo's Remarks to the Press* (Apr. 17, 2019), *available at* https://cl. usembassy.gov/secretary-of-state-michael-r-pompeos-remarks.........................12

Webster's New World College Dictionary (4th ed. 2004) .......................................50

**INTRODUCTION**

In 1960, the Castro regime confiscated 11,000 acres of land and an exclusive concession to exploit port facilities in Mariel Bay, Cuba, from five siblings of the Blanco Rosell family.  Today, a state-of-the-art container terminal uses that land and exploits that concession as part of the Cuban government's bid to position itself as a leader in the lucrative market for port services.

The Helms-Burton Act gives victims of such confiscations an action for damages against anyone who "traffics" in their stolen property.  22 U.S.C. § 6082(a)(1).  That includes anyone who "engages in a commercial activity using or otherwise benefiting from confiscated property," and anyone who "directs," "participates in," or "profits from" another person's trafficking.  *Id.* § 6023(13)(A).

Shipping giant Seaboard Marine Ltd. did both.  Its vessels called at the Mariel terminal dozens of times, delivering containers of cargo.  And it contracted with Cuban entities to unload those containers and arrange for their transport inland.  That is trafficking, plain and simple.

In 2020, the last surviving Blanco Rosell sibling, Odette Blanco de Fernandez sued Seaboard in the U.S. District Court for the Southern District of Florida along with her late siblings' heirs and the personal representatives of their estates.  The complaint alleged that Seaboard's use of the terminal trafficked in the concession

1

because the terminal exploited rights that belonged to the siblings. It also alleged that Seaboard trafficked in the siblings' real property.

The district court (Bloom, J.) dismissed the heirs and estates, but allowed Ms. de Fernandez to proceed. At the close of discovery, the court granted Seaboard's motion for summary judgment, holding that Ms. de Fernandez had not shown that Seaboard trafficked in her family's property.

The court held first that the concession covered only a small patch of land on the Bay's eastern side, far from the container terminal. That holding upended the terms of a bargain between the former Cuban government and one of the Blanco Rosell siblings' companies. The 1955 decree granting the concession referred to the Bay as a whole for a reason. The concession's broad rights were consideration for the company's commitment to modernize the Bay's badly outdated port, thus accomplishing one of the government's top economic development priorities.

The court thought the decree's nonbinding "whereas" clauses called for a narrower grant. But it is blackletter law that prefatory clauses cannot narrow the operative part of a contract. And in any event those clauses confirm the concession's broad grant, touting the benefits the government hoped to receive in exchange.

The district court also rejected the claim that Seaboard trafficked in the siblings' real property. The court acknowledged there was a dispute over whether the terminal extended onto confiscated land. It nevertheless granted summary

judgment on the ground that there was no evidence that Seaboard or its Cuban partners engaged in any conduct on the part of the terminal actually on that land.

The court's holding rested on a cramped interpretation of what counts as "trafficking" that finds no support in the Helms-Burton Act.  Under the Act, it is enough that Seaboard's business benefited from the terminal.  There was no basis for the court to require proof of Seaboard's presence on specific parts of a single facility.  And in any event, the record showed that Seaboard's Cuban partners benefited from the ability to transit the siblings' land beyond the terminal.

The district court also erred in dismissing the heirs and estates.  The court invoked a provision of the Helms-Burton Act that bars actions based on claims to confiscated property that were "acquired" after March 1996.  Since the late siblings died after that date, the court reasoned that their estates could not assert their claims.  That holding misunderstands the statute and Florida estate law.  Under Florida law, an estate cannot "acquire" anything; it is simply the decedent's property subject to administration.  And an estate's personal representative merely stands in the decedent's shoes.  Alternatively, the court should have allowed the heirs to proceed.  Reading the statute to bar both the estates' and heirs' claims would undermine the Helms-Burton Act's purposes and raise serious separation-of-powers problems.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331.  The district court entered final judgment on August 19, 2022. D.E. 270.  This appeal followed on September 1, 2022.  D.E. 271.  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Ms. de Fernandez owned an interest in a company granted a concession by decree in 1955 to exploit port facilities in Mariel Bay, Cuba.  The decree states that the concession covers "Mariel Bay," without further geographic limitation.  Did the court err by relying on nonbinding prefatory clauses to read that broad grant to reach only the site of a single dock on the Bay's eastern side?

2.    The Helms-Burton Act imposes liability on anyone who engages in "commercial activity using or otherwise benefiting from confiscated property." Seaboard berthed its ships at a container terminal in Mariel Bay and contracted with Cuban entities to unload their cargo and arrange for its delivery inland.  The district court recognized there was a genuine dispute over whether the terminal extended onto confiscated property.  Did the court err by nevertheless granting summary judgment on the grounds there was no evidence Seaboard engaged in "activity" on the part of the terminal actually on confiscated land?

3.    The Helms-Burton Act bars actions based on claims to confiscated property that were "acquired" after the Act's 1996 effective date.  Ms. de Fernandez's

4

four brothers each died after 1996, but their estates remain under administration. May the personal representatives of those estates step into the late siblings' shoes and assert their claims in this case? Alternatively, may the late siblings' heirs assert their claims?

## STATEMENT OF THE CASE

### A.    The Blanco Rosell Siblings' Property in Mariel Bay, Cuba[1]

Appellants Odette Blanco de Fernandez and her late siblings, Alfredo Jr., Byron, Enrique, and Florentino Blanco Rosell, each owned an equal, 20% share of their family's businesses and property. D.E. 268 at 3, 10. Their holdings included two companies—Compañía Azucarera Mariel, S.A. and Maritima Mariel, S.A.— with land and operations in northwest Cuba's Mariel Bay. D.E. 268 at 3.

Azucarera Mariel held title to 11,000 acres of land, mostly on the Bay's west side, near an outcropping of land called the Angosta Peninsula. D.E. 268 at 4, 23-24; *see* D.E. 268 at 32-33; D.E. 222-1 at 16 (¶26). It also owned the assets of Central San Ramón, S.A., a sugar refinery the Blanco Rosell family bought in 1949. D.E. 268 at 5. Maritima Mariel owned port facilities first developed by Central San

---

[1] References to the record are to the district court docket number and, where available, the page number generated by the ECF system. For documents without an ECF-generated page number, page references are to the internal pagination used in that document. Paragraph, line, and section numbers are referenced in parentheses where available.

Ramón to export sugar. Those facilities sat on the Bay's eastern side, in a part of the town of Mariel known as Punta Coco Solo. D.E. 268 at 4-5, 21; D.E. 198-4 at 3.

### 1.    *Azucarera's Landholdings Around Mariel Bay*

Azucarera Mariel landholdings on Mariel Bay's west side comprised property purchased in 1949 from the same family that owned Central San Ramón. D.E. 268 at 3-5. That property originally included most, if not all, of the Angosta Peninsula. D.E. 268 at 3-4; *see* D.E. 178-27 at 7-8. In 1945, however, the Cuban government expropriated a portion of those holdings to build a naval air station. D.E. 268 at 4.



D.E. 178-27 at 8 (fig. 6) (cropped; annotations in original).

The westernmost extremity of the air station borders a fence line that divides the peninsula from the land to the west. D.E. 178-27 at 2-5. As the map above shows, Azucarera acquired the area surrounding the air station. D.E. 268 at 25; *see* D.E. 178-27 at 2-5.

2.    *Maritima's Concession to Exploit Mariel Bay's Port Facilities*

Maritima Mariel's port facilities at Punta Coco Solo grew out of a dock and warehouses that had been used by Central San Ramón to export sugar since the early 1900s.  D.E. 268 at 4.  For decades, Central San Ramón ran the port, the dock, and warehouses without official approval.  D.E. 198-4 at 2.  In 1934, the company applied for and obtained the right to use them privately.  D.E. 198-4 at 2.  That concession was among the assets Azucarera Mariel acquired when the Blanco Rosell family bought Central San Ramón in 1949.  D.E. 268 at 5.

By 1955, Mariel Bay had become Cuba's second most important port.  D.E. 63-1 at 2-3.  But it lacked the "large port facilities" necessary to its "important role in the public economy."  D.E. 63-1 at 2.  Maritima Mariel developed a plan to change that.  The company filed a proposal with Cuba's National Financing Agency for a loan and permission to build new "walls, docks, [and] warehouses" in and around its property.  D.E. 63-1 at 2, 4.  It also sought permission to return the original dock and warehouses, approved for private use by the 1934 concession, back to public use.  D.E. 63-1 at 4.[2]

_____

[2] Appellants cite Seaboard's translation of the decree for the sake of simplicity because that is the version cited by the district court.  *See, e.g.*, D.E. 268 at 20 (citing D.E. 63-1).  Appellants note, however, that Seaboard's translation is flawed and reserve their right to challenge the use of that translation.

In a decree issued by the Minister of Public Works, the government found that it was in the public's interest that Maritima "rapidly carry forward" its proposed improvements. D.E. 63-1 at 3. In consideration for that undertaking, the operative part (*resuelvo*) of the decree provided:

> A concession is granted to "Maritima Mariel, S.A." to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel, Province of Pinar del Rio, and for the construction of new buildings and works, without detriment to the vested rights of third parties and entities by virtue of previous and current concessions for the same goals as those expressed [in this] paragraph . . . .

D.E. 63-1 at 4 (§1). The concession's term was fixed at 70 years, or through at least 2025. D.E. 63-1 at 6 (§3).

In connection with this concession, the decree declared that building the "Maritime Terminal" described in Maritima's application to the Financing Agency and any related construction or in-filling of the Bay was in the "public interest." D.E. 63-1 at 4-5 (§1). The decree gave Maritima various extraordinary authorities, including the power of eminent domain. D.E. 63-1 at 5-6 (§§2-3). The decree also granted Maritima's request to convert Central San Ramón's old dock and warehouses to public use. D.E. 63-1 at 8 (§10).

The decree imposed conditions commensurate with the value of the concession it conferred. It required Maritima to start construction of the terminal within 18 months and to finish it within four years or forfeit its rights. D.E. 63-1 at 6 (§3). It required Maritima to post a bond "as guarantee for [its] performance," and

to submit to government supervision.  D.E. 63-1 at 8 (§ 12).  And it required Maritima to provide its services at a steep discount to government entities, to cap its fees, and to build a lighthouse and customs house if the government determined they were necessary.  D.E. 63-1 at 7-8 (§§ 4-5, 7-8).

### B.    Castro's Regime Confiscates the Blanco Rosell Siblings' Property

In 1960, the Castro regime issued an edict confiscating all of the Blanco Rosell siblings' property.  D.E. 63-2 at 4.  That included Azucarera's 11,000 acres and Maritima's concession over Mariel Bay.  D.E. 268 at 3.  The siblings fled Cuba soon after, eventually settling in the United States.  D.E. 222-1 at 13 (¶¶ 3-4).  The Cuban government has never compensated them for the confiscation.  D.E. 45 at 21 (¶ 80).

In the decades since, the Cuban government has developed the property it stole into an engine of economic development.  It established a "Special Economic Zone"—known by its Spanish acronym, "ZEDM" for Zona Especial De Desarollo Mariel—that spans Azucarera's landholdings on the Bay's west side.  D.E. 268 at 32-33; *see* D.E. 45 at 21-22 (¶¶ 82-88).  And, in 2014, it opened a container terminal on the Angosta Peninsula to serve vessels shipping goods to, from, and through Cuba.  *See* D.E. 45 at 22 (¶¶ 85-86).  The terminal extends beyond the footprint of the former naval air station, onto surrounding land Cuba stole from the Blanco Rosell siblings.  *See* D.E. 178-27 at 6 & fig. 4.



D.E. 178-27 at 9 (fig. 7) (cropped; annotations in original).

The terminal is operated by Terminal de Contenedores de Mariel S.A. (TCM). D.E. 268 at 33.  TCM's website provides the exact coordinates of its offices, 23°00'01.0"N 82°46'47.6"W.  *See* TC Mariel, *available at* https://www. tcmariel.cu/?lang=en.  Plugged into Google Earth, a freely available, machine-generated compilation of satellite images, those coordinates point to a spot just beyond the fence line—remnants of which are visible in the satellite images—highlighted in the figure above.  *See* Google Earth, *available at* https://earth. google.com; *see also* D.E. 184-5; D.E. 184-1 at 93:21-25.

## C.    Congress Enacts the Helms-Burton Act to Compensate Victims of the Regime's Confiscations

In 1996, Congress found that confiscated assets like those taken from the Blanco Rosell family had become a lifeline for the Castro regime.  Isolated by the collapse of the Soviet Union, the Cuban government was leveraging stolen property to attract "hard currency, oil, and productive investment and expertise."  22 U.S.C.

10

§6081(6); *see id.* §6021(1). "This 'trafficking,'" Congress found, "undermine[d] the foreign policy of the United States" to bring about regime change in Cuba and "to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government." *Id.* §6081(6).

In response, Congress enacted the Helms-Burton Act. Title III of the Act provides U.S. nationals with claims to property confiscated by the Cuban government a private right of action for damages against anyone who "traffics" in that property. 22 U.S.C. §6082(a)(1).

The Act's definition of "traffick[ing]" sweeps broadly. It includes "knowingly and intentionally" (i) "manag[ing]," "possess[ing]," "obtain[ing] control of," "us[ing]," or "acquir[ing]" an "interest in confiscated property"; (ii) "engag[ing] in a commercial activity using or otherwise benefiting from confiscated property"; and (iii) "caus[ing]," "participat[ing] in, or profit[ing] from" trafficking "by another person" without consent of the property's rightful owners. 22 U.S.C. §6023(13)(A).

To "eliminate any incentive that might otherwise exist" for foreigners "to transfer claims to confiscated property to U.S. nationals in order to take advantage of the remedy created by" the Act, Congress included a statutory bar date. H.R. Rep. No. 104-202, at 40 (1995). "In the case of property confiscated before" the Act's effective date of March 12, 1996, Title III provides that

a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996.

22 U.S.C. § 6082(a)(4)(B).

A plaintiff with an actionable claim to confiscated property may bring suit under Title III at any time within two years "after the trafficking giving rise to the action has ceased to occur." 22 U.S.C. § 6084. But the President may "suspend the right to bring an action" for six months at a time if he "determines" that "suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba." *Id.* at § 6085(c)(1)(B); *see id.* § 6064(a).

Successive presidential administrations suspended the right to bring an action under Title III from the day the Act came into force until the Trump administration allowed the suspension to lapse in May 2019. 22 U.S.C. § 6085(c)(1)(B); *see* U.S. Department of State, *Secretary of State Michael R. Pompeo's Remarks to the Press* (Apr. 17, 2019) (announcing the change), *available at* https://cl.usembassy.gov/secretary-of-state-michael-r-pompeos-remarks/.

### D.    Seaboard Traffics in the Blanco Rosell Siblings' Property

Since 2019, Seaboard has carried shipping containers loaded with cargo from the United States to the Mariel Bay container terminal. D.E. 268 at 5, 25. Under a contract with TCM, Seaboard uses the terminal's facilities to unload its cargo and dock its vessels. *See* D.E. 199-12 at 8 (§ 2.2). Among other things, TCM is responsible for loading and unloading Seaboard's containers, moving them "from

wharf to stocking area" to "truck[s] or rail car[s]." D.E. 199-12 at 8 (§ 2.2), 12 (§ 4.2), 13 (§ 4.2(h)), 37 (§ 1(c)). Seaboard also contracts with another Cuban entity, Agencia Maritima Taina S.A., to handle "all customary services of a shipping company's agent," including coordinating "arrang[ing] inland haulage" from the terminal to the cargo's ultimate destination, a trip that necessarily transits land confiscated from the Blanco Rosell siblings' company, Azucarera. D.E. 199-6 at 3 (§ 2); D.E. 178-27 at 8 (fig. 6).

### E.    Proceedings in the District Court

The plaintiffs in this case are the last surviving Blanco Rosell sibling, Odette Blanco de Fernandez, the heirs of her four late brothers, and the personal representatives of the brothers' estates. In 2020, they sued Seaboard in the U.S. District Court for the Southern District of Florida, asserting a claim for damages under Title III. D.E. 1; *see* D.E. 45 at 2 (¶ 1).

The plaintiffs' amended complaint alleged that the container terminal and other facilities within the Special Economic Zone in Mariel Bay exploited the plaintiffs' confiscated land and the concession rights conferred under the 1955 decree. D.E. 45 at 21-22 (¶¶ 82-88). Seaboard knowingly and intentionally trafficked in that confiscated property, the complaint alleged, by using, benefiting, and profiting from the container terminal and other facilities to deliver dozens of ships' worth of goods to Mariel, even after the plaintiffs sent Seaboard written notice

advising Seaboard that it was trafficking in their confiscated property.  D.E. 45 at 24-28(¶¶91-103).  The complaint also alleged that Seaboard participated in or profited from trafficking by others.  D.E. 45 at 5(¶14), 25(¶96), 29(¶107).  Seaboard moved to dismiss.  D.E. 52.

1.  *The District Court's Motion-To-Dismiss Ruling*

The district court denied the bulk of Seaboard's motion to dismiss.  *See* D.E. 66.  It held that the plaintiffs adequately alleged that Seaboard knowingly and intentionally trafficked in the Blanco Rosell siblings' confiscated property by using and benefiting from "the Port of Mariel and the container terminal."  D.E. 66 at 9.  And it agreed that the plaintiffs sufficiently alleged that Seaboard trafficked indirectly in confiscated property by profiting from or participating in the Cuban Government's trafficking in the Blanco Rosell siblings' "70-year Concession as well as their right to the land holdings on which the ZEDM sits."  D.E. 66 at 13.

But the court dismissed the claims of the heirs and estates of the four deceased siblings, holding that they had acquired their interests in the confiscated property too late.  D.E. 66 at 14-16.  There was "no dispute" that the siblings themselves acquired their interests in the property well before Title III's March 1996 bar date.  D.E. 66 at 16 & 14 n.6; *see* 22 U.S.C. § 6082(a)(4)(B).  But the court reasoned that their heirs "could not have acquired a claim to the Confiscated Property" until the late Blanco Rosell siblings died in the 2000s.  D.E. 66 at 15.  The court relied for its holding on

this Court's non-precedential decision in *Gonzalez v. Amazon.com, Inc.*, 835 F. App'x 1011 (11th Cir. 2021) (*per curiam*), even though the Court addressed only the effect of a transfer from a living relative—not an inheritance.

The district court held that the estates—represented by their personal representatives—could not maintain an action under Title III for the same reason. In the court's view, the late siblings' interests in the confiscated property "became property of their respective estates" when they died. D.E. 66 at 16. The court did not address Florida law defining an estate as "the property of a decedent that is the subject of administration," rather than an entity capable of acquiring or holding property in its own right. Fla. Stat. § 731.201(14).

The court denied the plaintiffs' motion for partial reconsideration, D.E. 75 at 9, and Ms. de Fernandez's claim proceeded to discovery.

## 2.    *The District Court's Summary Judgment Ruling*

After extensive discovery, Seaboard moved for summary judgment. Seaboard did not dispute that it uses the container terminal and contracts with TCM and Taina to ship its cargo inland. *See* D.E. 268 at 27-29. Nor did Seaboard dispute that the Castro regime confiscated land and concession rights from Maritima and Azucarera. *See* D.E. 268 at 8-9. Instead, Seaboard argued that Ms. de Fernandez never owned an interest in either company, that Seaboard never knowingly or intentionally

trafficked in the confiscated property, that there was no proof of damages, and that its trafficking activities were incident to lawful travel to Cuba. *See* D.E. 268 at 7-8.

The court rejected Seaboard's primary argument. It held that Ms. de Fernandez had presented evidence of her ownership interest in both Maritima and Azucarera. D.E. 268 at 10, 24-25. But it concluded that Ms. de Fernandez had not shown that Seaboard trafficked in that property.

The court held first that the 1955 decree "unambiguous[ly]" granted a concession confined to the footprint of the dock and warehouses first built by Central San Ramón on the east side of Mariel Bay. D.E. 268 at 15. Because the Container Terminal and other port facilities are on the west side of the Bay, the court reasoned, there was no evidence that Seaboard trafficked in Maritima's rights. D.E. 268 at 23.

The court acknowledged that Azucarera's landholdings presented a distinct issue. It agreed that there was evidence that would allow a jury to find that Ms. de Fernandez held rights to approximately 11,000 acres, some of which were "located in the area surrounding the naval air station on the west side of the Bay." D.E. 268 at 25. And the court acknowledged there was a dispute as to whether the container terminal extended onto that land. D.E. 268 at 28; *see also* D.E. 268 at 23 n.17. But it deemed that dispute immaterial because it saw "no evidence" that Seaboard "trafficked" in a part of the terminal that actually sat on Azucarera's land. D.E. 268 at 28-29. The court did not attempt to square that holding—apparently premised on

the notion that trafficking must involve physical presence—with Title III's text.  Nor did it explain how Seaboard's business could be confined to the peninsula's tip when it depended on delivering goods to their ultimate destination, something that required transit over and the use of infrastructure on confiscated land.

The court also held there was no evidence that TCM's office was on that land.  D.E. 268 at 25.  An unchallenged expert report set out the boundaries of Azucarera's property.  D.E. 178-27 at 1-2.  But the court struck as untimely under Rule 37 a subsequent declaration by the same expert that used publicly available maps to pinpoint the locations of the office inside those boundaries.  *See* D.E. 256 at 6-9; D.E. 201-5.  The court did not discuss the map Seaboard itself introduced, showing the location of the office.  D.E. 184-5.

The court declined to reach Seaboard's arguments about whether its conduct was knowing and intentional, whether the record supported the claimed damages, or whether Title III's exception for lawful travel applied to Seaboard's conduct.  But the court acknowledged that those issues involved disputes of fact.  D.E. 268 at 32, 36 & nn.23-24 (noting the unresolved disputes and expert testimony on damages and the lawful travel exception); *see United States v. F.E.B. Corp.*, __ F.4th __, 2022 WL 16557827, at *7 (11th Cir. 2022) ("'As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial.'"); D.E. 183-6 (plaintiffs' pre-suit letter putting Seaboard on notice).

17

This appeal followed.

## SUMMARY OF ARGUMENT

I.A.  The 1955 decree that granted Maritima its concession struck a bargain. In exchange for Maritima's commitment to build badly needed port facilities, the decree conferred the right to exploit those facilities "***in the Bay of Mariel***" exclusively.  D.E. 63-1 at 4(§1) (emphasis added).  That exclusivity was critical— the concession would be worthless if the government could authorize competing terminals across the Bay.  And it was reflected in the extensive conditions the decree attached to Maritima's performance.

B. The district court rewrote the terms of Maritima's bargain.  The court misread the decree's prefatory language to mean that Maritima had sought rights only to the site covered by the 1934 concession granted to its predecessor.  Not so. Maritima applied to build a modern port facility on and around its property in Mariel that could not (and did not) fit within the confines of the single dock at issue in the 1934 concession.  It ***separately*** sought permission to convert the dock approved for private use in 1934 to public use.  D.E. 63-1 at 4.

In any event, the "whereas" clauses furnished no basis to narrow the concession's scope.  For one thing, prefatory clauses cannot control over contrary operative language.  *See Am. Nat'l Bank of Jacksonville v. F.D.I.C.*, 710 F.2d 1528, 1534 (11th Cir. 1983).  For another, there was no inconsistency.  The prefatory

language explained *why* the government was granting Maritima a concession; only the operative provisions said *what* that concession entailed.  If there could be any ambiguity, it was for a jury—not the court—to resolve.

II.A.  Seaboard's use of the container terminal constituted "trafficking" in two more ways, each of which independently warrants reversal.  First, Seaboard's business "us[ed]" or "otherwise benefit[ed] from" the land taken from Azucarera Mariel.  22 U.S.C. § 6023(13)(A)(ii).  The district court acknowledged that there was a genuine dispute about whether the container terminal extended partly onto confiscated land.  D.E. 268 at 23 n.17, 28.  The court nevertheless granted summary judgment on the ground there was no evidence that Seaboard set foot on the ***portion*** of the terminal built on that land.  That was error.  The Helms-Burton Act requires nothing more than proof that a defendant's ***commercial activity*** used or benefited from confiscated property.  Physical presence is not a prerequisite to liability.

The district court brushed off the statutory language in a footnote, asserting that there was "no evidence" that Seaboard's business "otherwise benefit[ed]" from confiscated property because there was no evidence that any "port facilities" sat on confiscated land.  But the record showed the Cuban government treats the terminal as one facility.  Having determined that a jury could find the terminal extended onto Azucarera's land, the court should have done the same.

In any event, there *was* evidence of physical presence. The unchallenged report of Ms. de Fernandez's expert cartographer, Scott Edmonds, included maps showing the location of the confiscated land. *See* D.E. 178-27 at 8-9. Seaboard's own map of the same area, from a web-based mapping platform, included automatically generated annotations showing the office of terminal operator and Seaboard partner, TCM. D.E. 184-5. Courts have held repeatedly that such annotations are judicially noticeable, meaning that a jury would have to accept them as "conclusive." Fed. R. Evid. 201(f). And a jury comparing the maps side-by-side could reasonably conclude that Seaboard's map showed TCM's office on land that Edmonds identified as Azucarera's.

B. The record also showed that Seaboard "caus[ed], direct[ed]," or "profit[ed] from" trafficking in Azucarera's property by its Cuban partners, TCM and shipping agent Taina. 22 U.S.C. § 6023(13)(A)(iii). It was undisputed that Seaboard contracted with its partners to transfer containers from its ships to trucks or railcars and arrange for transport inland. And there was evidence from which a jury could find that the only way inland was through Azucarera's property. That raised a triable question whether TCM's and Taina's businesses "benefit[ed] from" access to and transit through that land. 22 U.S.C. § 6023(13)(A)(ii).

The district court nevertheless granted summary judgment on the ground that there was no evidence that Seaboard asked its partners to perform under the

contracts. D.E. 268 at 30-31, 34-35. That was doubly wrong. For one thing, the provisions dealing with TCM's and Taina's obligations related to transport inland did not require a request from Seaboard. D.E. 199-12 at 37 (§1(c)); D.E. 199-6 at 4 (§3(b)(iv)). For another, Ms. de Fernandez was entitled to the reasonable inference that Seaboard would not have sent load after load of frozen chicken parts to Mariel Bay unless TCM and Taina were, in fact, ensuring those containers made it off the pier.

III. Finally, the Helms-Burton Act's bar date poses no obstacle to the claims asserted by the late Blanco Rosell siblings' estates. That provision applies to claims to property that were "acquired" after 1996. But Florida is clear that neither estates nor their personal representatives "acquire" anything in the plain sense of that word. Rather, they stand in the decedent's shoes. *See Sullivan v. Sessions*, 80 So. 2d 706, 707 (Fla. 1955). And even if the claims passed to the late siblings' heirs, reading the statute to bar both the heirs' and the estates' claims would expand the bar date's effect far beyond the narrow concern it was meant to address, undermine the statute's purposes, and raise serious separation-of-powers concerns.

## ARGUMENT

### I. Seaboard Trafficked in Maritima Mariel's Exclusive Right to Exploit Port Facilities in Mariel Bay

No one disputes that Seaboard berthed its vessels at the container terminal erected by the Castro regime on the west side of Mariel Bay. D.E. 268 at 5. Under

the terms of a concession granted by the former Cuban government, the exclusive right to exploit a port facility in the Bay belonged to the Blanco Rosell siblings' confiscated company, Maritima Mariel. Seaboard thus trafficked in Maritima's property by engaging in commercial activity that used or benefited from Maritima's rights. 22 U.S.C. § 6023(13)(A)(ii), (iii). The district court avoided that conclusion only by misinterpreting the scope of those rights.

The 1955 decree that granted Maritima its concession embodied a carefully balanced bargain. Maritima undertook to solve a pressing public need by building a modern maritime terminal at the Port of Mariel. It agreed to carry out that undertaking on an aggressive schedule, under government supervision, and at the risk of forfeiting its rights if progress lagged. It promised to charge only government-approved rates, to offer discounted services to public entities, and to build facilities for government use. In exchange, the Cuban Ministry of Public Works granted Maritima an exclusive concession to "exploit public docks and warehouses in the Bay of Mariel" for a 70-year term.

The district court rewrote that bargain. It held that the decree conferred only the right to build and run a terminal on the Bay's east side. In doing so, the court mistook the decree's *quid* for its *quo*. It treated Maritima's undertaking to build a public terminal as though that obligation was its own reward. The court reached that erroneous result by misinterpreting the decree's nonbinding "whereas" clauses and

22

giving them controlling effect over the operative language. That was error. The plain language of the decree's operative provisions confers rights over the ***whole*** of Mariel Bay. The "whereas" clauses do not conflict with, and indeed confirm, that reading. And even if there had been a conflict, the solution would be to deny summary judgment so that a jury could determine what the decree conferred.

<u>Standard of Review</u>. The district court's interpretation of the 1955 decree is a legal question reviewed *de novo*. *See Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015).[3]

## A.    The 1955 Decree Conferred Rights Over the Whole of Mariel Bay

A contract's "actual language" is the "best evidence" of the parties' intent. *Internaves de Mexico s.a. de C.V. v. Andromeda Steamship Corp*., 898 F.3d 1087, 1093 (11th Cir. 2018) (applying federal common law). The very first operative paragraph of the 1955 decree declared that "[a] concession is granted" to Maritima to exploit port facilities "in the Bay of Mariel," subject only to the vested rights of earlier concessionaires. D.E. 63-1 at 4 (§ 1). "[T]he plain meaning of that language controls." *Internaves*, 898 F.3d at 1093. It confers rights over the ***whole*** Bay.

---

[3] The district court interpreted the decree according to "U.S. principles of contract interpretation." D.E. 268 at 18-19. Although Seaboard argued "for the first time in a footnote [in its reply] that Cuban law should apply," it did so "without meaningful analysis" and without identifying any relevant difference between U.S. and Cuban law. D.E. 268 at 16. The court thus found Seaboard had waived any objection to the application of U.S. law. D.E. 268 at 19.

That broad grant was Maritima's compensation for addressing an urgent public need. The decree's recitals explained that the Port of Mariel had become Cuba's second largest port—a vital source of customs revenue "that has such an important role in the public economy." D.E. 63-1 at 2. Yet it remained "without large port facilities or guarantees for the workers and for the State." D.E. 63-1 at 2. Maritima offered a solution.

Maritima planned to build a series of "different works such as walls, docks, warehouses, dredging, fillings-in, and others" on and around its property in Mariel. D.E. 63-1 at 2. Those improvements, the government found, would provide the facilities that "importers, exporters, workers, the State and the public at large" needed. D.E. 63-1 at 3. Maritima was the right company to see that undertaking to completion. It was a Cuban-owned business, specializing in "the construction of docks and maritime terminals" and "public warehouses." D.E. 63-1 at 3. Its finances and plans had been "verified" and deemed equal to the task. D.E. 63-1 at 3. Seeing a solution to its problem, the government offered Maritima the assurance that its terminal would be the only facility of its kind in the Bay. D.E. 63-1 at 4-7 (§§ 1-3).

### 1.    *The Concession Covered the Whole Bay*

The paragraph that conferred the concession—the very first in the operative part of the decree—granted Maritima rights "to plan, study, execute, maintain, and exploit public docks and warehouses ***in the Bay of Mariel***, Province of Pinar del

Rio, and for the construction of new buildings and works," subject only to the vested rights of prior concessionaires.  D.E. 63-1 at 4 (§ 1) (emphasis added).  It contained no further geographic limitation on Maritima's rights.  That was deliberate.

The next paragraph "declared" that the construction of three categories of "works" was in the public interest.  D.E. 63-1 at 4-5 (§§ 1-2).  Unlike the wording of the concession to exploit public docks and warehouses conferred in the first paragraph, the descriptions of these works *were* geographically specific.  Subpart "A)," for example, referred to facilities "contained in the [memorandum] and maps filed by [Maritima] with the National Financing Agency."  D.E. 63-1 at 4 (§ 1(A)).  The inclusion of that limitation in this latter paragraph underscores that its omission from the first paragraph was intentional.  *See In re Cumbess*, 960 F.3d 1325, 1334 (11th Cir. 2020) (explaining that *expresio unius* " 'justif[ies] the inference that items not mentioned were excluded by choice, not inadvertence' ").

The carveout for existing concessionaires further supports the plain reading of the grant.  That clause would be meaningless if the concession were confined to the construction of the works described in Maritima's application.  After all, the application described plans for construction "in low lands and mangroves *of [Maritima's] property*" and the adjacent littoral zone.  D.E. 63-1 at 2 (emphasis added).  It is difficult to see what rights prior concessionaires could have over Maritima's own property or waters accessible only through that property.

25

Moreover, subsequent sections of the decree treated the concession conferred in the first paragraph as distinct from the specific plans for the "construction of new buildings and works" set forth in Maritima's application to the National Financing Agency. While some Parts imposed requirements related to the construction of "the works referred to in Part First," *see, e.g.*, D.E. 63-1 at 8 (§ 9), others referred generally to Maritima's obligations as concessionaire, *see, e.g.*, D.E. at 7-8 (§§ 4-8).

2.    *The Concession Was Prospectively Exclusive*

The decree also made clear that the concession it granted was prospectively exclusive. The first paragraph made Maritima's rights subject only to the "vested rights" of anyone with "***previous and current*** concessions for the same goals"—*i.e.*, for the exploitation of public docks and warehouses. D.E. 63-1 at 4 (§ 1) (emphasis added); *accord* D.E. 63-1 at 9 (§ 18). The decree did not contemplate subsequent grants of overlapping rights during the concession's 70-year term. To the contrary, the decree gave Maritima the option to seek approval for additional construction in other parts of the Bay at any time in the first 10 years of the concession's term. D.E. 63-1 at 6 (§ 3). And Seaboard presented no evidence that the container terminal was covered by any previously granted concession.

That exclusivity was critical. Maritima's ability to "fulfill [its] obligations" to the National Financing Agency was predicated on the revenue the company projected it would earn from operating the maritime terminal. D.E. 63-1 at 3.

Because Mariel Bay was "without large port facilities," D.E. 63-1 at 2, those revenue projections necessarily assumed that Maritima's would be the only facility of its kind.  It would make no sense for the government to finance the project based on future revenues unless it was confident those revenues would materialize.

Moreover, the concession would have had little value to Maritima if the government could authorize competing port facilities across the Bay.  Although the plaintiffs offered expert evidence to that effect, D.E. 178-30 at 1, it is a matter of common sense.  *See, e.g.*, *In re Binghamton Bridge*, 70 U.S. (3 Wall.) 51, 78 (1865) ("madness" to read a contract to build a bridge as allowing the government "to authorize other adventurers to build other bridges" nearby); *Appleby v. Delaney*, 271 U.S. 403, 413 (1926) ("not reasonable" to read contracts to buy submerged land as giving "city authorities the absolute right completely to nullify the chief consideration" by forbidding owners from filling in the land).  It would make little sense for Maritima to invest in a terminal subject to extensive conditions if a competing facility could be opened across the Bay.

3.    *The Concession's Conditions Confirm its Breadth*

The plain meaning of the granting language is further reinforced by the conditions the decree attached to the concession.  The decree required Maritima to start construction within 18 months and finish within four years.  D.E. 63-1 at 6 (§ 3).  It required Maritima to post a performance bond.  D.E. 63-1 at 8 (§ 12).  And it

provided that Maritima would forfeit the concession altogether if it failed to strike a deal with the National Financing Agency to pay for the construction within a year. D.E. 63-1 at 7 (§ 3).

The decree also imposed conditions on how the port was to be run. Maritima's fees were capped. D.E. 63-1 at 7 (§ 5). It was required to offer its services "to the State, the Province, and the Municipality" at a 30% discount. D.E. 63-1 at 7 (§ 4). And it had to build a lighthouse and customs house if the government determined they were needed. D.E. 63-1 at 7-8 (§§ 4-5, 7-8).

None of those conditions would have been necessary if the only rights conferred by the concession were to build a terminal on the site of Maritima's existing dock. The National Financing Agency could presumably have exacted whatever protection it required in the separate agreement the decree contemplated it would execute with Maritima. D.E. 63-1 at 7 (§ 3). And the risk that Maritima might sit on its rights or fail to complete construction would be no concern if a competitor could open its own terminal next door.

The better reading is that the decree's first operative paragraph means exactly what it says: The Cuban government granted Maritima an exclusive, 70-year concession to exploit port facilities throughout Mariel Bay.

**B.    The District Court's Contrary Reading Cannot Be Reconciled With the Decree's Plain Language**

Rather than giving effect to the decree's plain language, the district court rewrote Maritima's bargain with the Cuban government.  D.E. 268 at 19.  Stitching together phrases from two "whereas" clauses, the court concluded that Maritima had applied only for the right to build on the property at issue in the 1934 concession.  D.E. 268 at 19-20.  Since the "whereas" clauses referred to Maritima's application, the court reasoned that the operative language must be limited accordingly.  D.E. 268 at 21.  In the court's view, that meant "that when the Cuban Government granted the 1955 Concession 'to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel,'" it was only "granting a concession with regard to the geographic scope prescribed in the 1934 Concession"—namely, Punta Coco Solo.  D.E. 268 at 21.  Every step of that analysis is wrong.

To start, the court conflated two distinct requests that Maritima Mariel made of the National Financing Agency.  Maritima did not apply to build new facilities only on the site at issue in the 1934 concession.  D.E. 63-1 at 2.  That would have made no sense.  The 1934 concession covered just one small dock.  *See* D.E. 198-4.  It could not have hosted the ***multiple*** docks and warehouses Maritima planned.  Instead, Maritima applied for "financing and authorization" to build multiple new "docks, warehouses," and other works on and around its property in the town of Mariel.  And it ***separately*** sought permission "to convert to public use" the one

existing "dock and warehouses" that the 1934 concession had converted to private use.  D.E. 63-1 at 2, 4.

The decree described those two requests in separate "whereas" clauses, set pages apart.  And it granted them in separate operative Parts.  The decree's first Part granted a "concession" for "the construction of new buildings and works," making no reference to the 1934 concession.  D.E. 63-1 at 4 (§ 1).  The decree's tenth Part, by contrast, granted permission to convert "to the public service" the "dock and warehouses" at issue in the 1934 concession.  D.E. 63-1 at 8 (§ 10).  The sixteenth Part confirmed the distinction by referring to both "[t]he concession and the conversion to public use granted by the Decree herein."  D.E. 63-1 at 9 (§ 16).

The district court compounded its misreading of the "whereas" clauses by using them to narrow the plain language of the decree's operative provisions.  The court thus read the express grant of a concession throughout "the Bay of Mariel" as a grant confined to Maritima's property at Punta Coco Solo.  D.E. 268 at 21.  The court reasoned that according the concession its plain meaning would "read out the 'Whereas' clauses."  D.E. 268 at 21.  That was doubly wrong.

For one thing, it is well settled that a "prefatory statement . . . does not have binding effect."  *Peery v. City of Miami*, 977 F.3d 1061, 1071 (11th Cir. 2020) (construing a federal consent decree).  Although "whereas" clauses and recitals can shed light on the parties' intentions, they are "not an operative part of a contract"

and cannot control over contrary operative language. *Am. Nat. Bank of Jacksonville v. F.D.I.C.*, 710 F.2d 1528, 1534 (11th Cir. 1983); 17A Am. Jur. 2d Contracts § 373 (unambiguous operative provisions control). To the extent the court perceived a conflict between the "whereas" clauses and the operative Parts, it was appropriate to give controlling effect to the latter.[4]

For another, there was no conflict between the prefatory and operative parts of the decree on this point. The "whereas" clauses explained how Maritima's proposal to build new docks and warehouses would benefit the Cuban economy and fill a pressing need for expanded port facilities in the Port of Mariel. *See* D.E. 63-1 at 2-3. But they said nothing about what the government was offering Maritima in return. In other words, the "whereas" clauses said ***why*** the government was granting Maritima a concession. They did not say ***what*** the scope of that concession was; that was addressed only in the decree's operative provisions. The prefatory clauses could not contradict the operative parts on an issue they did not address.

---

[4] The district court treated the decree as a contract, but the same rule applies to statutes. *See, e.g.*, *Hawaii v. Off. of Hawaiian Affs.*, 556 U.S. 163, 175 (2009) ("a court has no license to" give operative effect to "whereas" clauses in a statute); *District of Columbia v. Heller*, 554 U.S. 570, 577-78 (2008) ("[A] prefatory clause does not limit or expand the scope of the operative clause."); *Yazoo & Mississippi Valley R. Co. v. Thomas*, 132 U.S. 174, 188 (1889) (explaining that prefatory clauses or preambles cannot change the scope of the operative clause); *cf. United States v. Bryant*, 996 F.3d 1243, 1260 (11th Cir. 2021) (applying the same rule to the federal Sentencing Guidelines).

Nor did the operative Parts of the decree limit the scope of the concession to the plans set forth in Maritima's application to the National Financing Agency. To the contrary, the first paragraph of the decree's first operative Part granted a concession "to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel" without qualification. D.E. 63-1 at 4 (§ 1). It made no mention of the application.

By contrast, where the operative Parts of the decree addressed matters specific to the application, they said so. In the second paragraph of the first Part, for example, the decree made findings of public necessity with respect to certain works "contained in the [memorandum] and maps filed by [Maritima] with the National Financing Agency." D.E. 63-1 at 4 (§ 1). The fact that the decree did not similarly reference Maritima's application in the paragraph granting the concession is thus further evidence that the rights granted Maritima were not limited to Punta Coco Solo.

At the very least, the decree's plain text and structure render the district court's interpretation untenable. If there could be any doubt as to the concession's scope, that doubt would be for a jury to resolve on remand.

## II.    Seaboard Trafficked in Azucarera Mariel's Land

Seaboard also trafficked in land held by another company confiscated from the Blanco Rosell siblings, Azucarera Mariel. Ms. de Fernandez presented evidence that Seaboard's use of the container terminal on the Angosta Peninsula fit the

statutory definition of "trafficking" in at least two different ways, either of which is independently sufficient to defeat summary judgment.

First, the district court acknowledged that there was a genuine dispute about whether the terminal where Seaboard unloaded its cargo was built partly on land confiscated from Azucarera.  D.E. 268 at 23 n.17, 28.  That raised a triable question whether Seaboard "engage[d] in a commercial activity using or otherwise benefiting from confiscated property."  22 U.S.C. § 6023(13)(A)(ii).

The court nevertheless granted summary judgment on the ground there was no evidence that Seaboard's "activity" took place on the ***portion*** of the terminal built on Azucarera's land.  D.E. 268 at 27-28.  That holding cannot be squared with the text of the Helms-Burton Act, which is satisfied by proof that a defendant's ***commercial activity*** used or benefited from confiscated property.  Nothing in the Act requires physical presence on or direct use of confiscated land.  And the record established physical presence, regardless.

Second, it was undisputed that Seaboard contracted with Cuban entities to transfer containers from its ships onto trucks or railway cars for transport inland. The record showed those entities trafficked in Azucarera's property in multiple ways.  That raised a triable question whether Seaboard "caus[ed], direct[ed]," or "profit[ed] from" their trafficking.  22 U.S.C. § 6023(13)(A)(iii).

The district court nevertheless granted summary judgment on the ground there was no evidence that Seaboard asked its partners to perform under the contracts. D.E. 268 at 30-31, 34-35. That blinks reality. It is undisputed that Seaboard has delivered container loads of frozen chicken parts to the terminal since 2019. D.E. 268 at 5. Those parts are not still sitting at the tip of the Angosta Peninsula three years on. Ms. de Fernandez was entitled to the reasonable inference that Seaboard's partners sent those shipments inland according to their contracts.

Standard of Review. This Court reviews summary-judgment rulings *de novo* "'considering the facts and drawing all reasonable inferences in the light most favorable to the non-moving party.'" *Brady v. Carnival Corp.*, 33 F.4th 1278, 1281 (11th Cir. 2022). Summary judgment is appropriate only if "the movant shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* A "'genuine' dispute exists if 'a jury applying [the applicable] evidentiary standard could reasonably find for either the plaintiff or the defendant' as to the material fact." *Id.* Questions of statutory interpretation are reviewed *de novo*. *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1236 (11th Cir. 1999).

### A. Seaboard Trafficked in Azucarera's Property Because the Container Terminal it Used is Built Partly on Confiscated Land

Seaboard unloaded its cargo at the container terminal on Mariel Bay's west side. Although part of that facility sits on the site of a naval air station built before

Castro took power, the district court acknowledged there was evidence that Azucarera owned the "surrounding" area. D.E. 268 at 25; *see* D.E. 178-27 at 8-9. And it found there was a genuine dispute about whether the container terminal extended onto that confiscated land. D.E. 268 at 23 n.17, 28.

The court held, however, that this dispute was not material—and thus could not preclude summary judgment—without evidence that Seaboard "trafficked" in the portion of the terminal built on confiscated land. D.E. 268 at 28-29. That holding rests on a cramped interpretation of what counts as "trafficking" that cannot be squared with the Helms-Burton Act's text, structure, or purpose.[5]

1.    *Seaboard's Business Benefited from Azucarera's Property*

A person "traffics" in confiscated property under the Helms-Burton Act if, among other things, that person "engages in a commercial activity using or otherwise benefiting from confiscated property." 22 U.S.C. § 6023(13)(A)(ii). That is exactly what Seaboard did.

It is undisputed that Seaboard engaged in the business of shipping cargo to Cuba. *See* 28 U.S.C. § 1603(d) (defining "commercial activity" to include "either a regular course of commercial conduct or a particular commercial transaction or

---

[5] The court dubbed the portion of the terminal where Seaboard berthed its ships the "Purple Box Container Terminal" based on coloration Seaboard's counsel added to a map in Seaboard's summary judgment brief. D.E. 268 at 26. That area sits within the footprint of the air station or on later-added landfill.

act"); *see* 22 U.S.C. § 6023(3) (incorporating § 1603(d) by reference).  It is likewise undisputed that Seaboard's business in Cuba depended on its ability to deliver containers to a facility where they could be removed from its vessels and placed on trucks or railcars for transit inland.  And, again, the court determined there was evidence from which a jury could find that the terminal Seaboard used sits partly on Azucarera's confiscated property.  D.E. 268 at 28.  There was accordingly a triable question whether Seaboard was "engag[ing] in a commercial activity using or otherwise benefiting from confiscated land" when it unloaded its cargo.  22 U.S.C. § 6023(13)(A)(ii).

The district court assumed without analysis that Seaboard could not "traffic" in Azucarera's property as a matter of law unless it was engaged in some "activity" on the portion of the terminal built on confiscated land.  *See* D.E. 268 at 28-29; *see* D.E. 268 at 31 (no triable question without evidence that Seaboard's agent, Taina, was "required to perform its duties in the" portion of the terminal on confiscated land).  That requirement has no basis in the statute.

The Act's definition of trafficking does not depend on a showing that the trafficker or its agents engaged in some conduct on the confiscated property—or even that the property was "used" at all.  The definition is satisfied so long as the "***commercial activity***" in which the trafficker engages "us[es] ***or otherwise***

36

*benefit[s] from*" the confiscated property.  22 U.S.C. § 6023(13)(A)(ii) (emphasis added).

The Act's structure reinforces that straightforward reading.  An adjacent subparagraph provides that a person may also traffic by "us[ing]" confiscated property.  22 U.S.C. § 6023(13)(A)(i).  That language would be superfluous if the very next subparagraph likewise required a showing that the trafficker "use[d]" the property. *See Johnson v. White*, 989 F.3d 913, 917 (11th Cir. 2021) (explaining that courts should avoid rendering any part of a statute superfluous).

Taking the Act's words at face value, Seaboard's repeated voyages to a facility a jury could conclude was built in part on confiscated land should have been more than enough to survive summary judgment.

2.    *There Was No Record or Legal Basis for the District Court to Subdivide the Terminal*

In a footnote, the district court commented there was "no evidence" that Seaboard "otherwise benefits from confiscated property" because there was no evidence that any "port facilities" were on the portion of the terminal on confiscated land.  D.E. 268 at 31 n.20.  That was incorrect as a factual matter; there ***was*** evidence that TCM's office was on confiscated property.  *See* pp. 40-44, *infra.*  It was also wrong as a matter of law.  Like the court's demand for evidence that Seaboard or its agents used specific portions of the terminal, there was no basis to subdivide the terminal into portions with and without "port facilities."

37

The record showed that the Cuban government treats the terminal as a single facility, not a patchwork of different properties. Ms. de Fernandez submitted a map produced by ZEDM, the Cuban government agency that oversees Mariel's Special Economic Zone. That map (excerpted below) uses gray hash lines to denote port facilities. It treats the *entire* developed area on the Angosta Peninsula as a single block. The district court recognized that this map and other evidence "place[d] the geographic scope of the Container Terminal in dispute." D.E. 268 at 32 n.21; *see* D.E. 268 at 28 (holding that scope of the terminal "is in dispute in light of the maps" Ms. de Fernandez provided). Seaboard cited no evidence to the contrary.



D.E. 202-6 at 2 (cropped).

Having determined that a jury could find the terminal extended into Azucarera's confiscated land, the district court should have treated the terminal as a single property. Its contrary approach defies common sense. Could an airline traveling to an airport built in part on confiscated land avoid liability by directing its

pilots to avoid rolling over a part of a runway that extended onto the confiscated property? Could a business that rented space in a building set in part on confiscated land avoid liability by directing its employees to walk only on a certain side of a hallway or to use only a certain elevator bank to avoid "facilities" on confiscated property? The district court's analysis makes these absurd questions unavoidable.

No principle of law requires that result. To the contrary, federal common law directs courts to treat legally distinct parcels of land "as one parcel" for purposes of addressing federal-law claims where doing so better reflects their practical relationship. *Murr v. Wisconsin*, 137 S. Ct. 1933, 1948 (2017). In *Murr*, the Supreme Court addressed a claim that a land use restriction had effected a regulatory taking. Because a regulatory takings claim requires courts to "'compare the value that has been taken from the property with the value that remains in the property,'" a key question was "'how to define the unit of property whose value is to furnish the denominator of the fraction.'" *Id.* at 1943-44.

Answering that question in *Murr*, the Court declined to give dispositive force to state property law or adopt a "formalistic" test. 137 S. Ct. at 1946-47. It directed courts instead to consider state law alongside the physical and practical relationship between formally separate parcels of land. *Id.* at 1945-46. The two parcels at issue in *Murr* were held by a common owner, contiguous, and worth more if sold together than apart. *Id.* at 1948-49. The Court held that those facts made it appropriate to

treat the formally distinct parcels as one for purposes of determining whether a taking had occurred.  *Id.* at 1948.

The same analysis is applicable here, and it compels the same result.  As in *Murr*, this case involves a federal right to compensation for confiscated property.  And, as in *Murr*, the facts here involve contiguous parcels, held by a common owner (the Cuban government), that are connected for practical purposes.  Indeed, the facts here are even stronger since the properties are united in a single facility.  Under *Murr*, that counsels treating the terminal as an undifferentiated whole for purposes of determining whether—as a matter of federal law—Seaboard's business "benefit[ed] from" the confiscated land.

3.    *The District Court's Analysis Fails on its Own Terms Because TCM's Office is on Confiscated Land*

In any event, there ***was*** evidence showing a key "port facilit[y]"—TCM's office—on confiscated land.   The district court held that the only evidence "pinpointing" the location of TCM's office was in a declaration, which the court had stricken as untimely under Rule 37.  D.E. 268 at 25; D.E. 256 at 6-9.  That was incorrect.  Even without the declaration, there was enough admissible evidence in the record showing the office's location to preclude summary judgment.

Edmonds's unchallenged report included satellite images of the Angosta Peninsula on which he had superimposed the footprint of the former naval air station.  *See* D.E. 178-27 at 8-9.  Edmonds was also able to highlight the path of the fence

40

line—shown with a dashed yellow line in the figure below—that previously marked the air station's westernmost border.



D.E. 178-27 at 9 (fig. 7) (cropped; annotations in original).

At Edmonds's deposition, Seaboard introduced the map below, generated by a mapping platform called Mapcarta. D.E. 184-5. That map included Mapcarta's own automatically generated annotations, showing the location of TCM's office, identified in Spanish as "*Oficina Terminal de contenedores MARIEL TCM*."



D.E. 184-5 (text in original).

A side-by-side, enlarged comparison shows that Seaboard's own map places TCM's office squarely on confiscated property. Among other features, the loop of roadway directly to the left of TCM's office on Seaboard's map (below, left) is clearly visible far beyond the fence line in Edmonds' map (below, right).



Left to right, D.E. 184-5 (cropped; annotations in original); D.E. 178-27 at 9 (fig. 7) (cropped; annotations in original).

A jury looking at those images could reasonably conclude that TCM's office is on confiscated land. *See* D.E. 178-27 at 8. At a minimum, reasonable minds could differ as to what the maps show. That is all it takes to defeat summary judgment. *Manners v. Cannella*, 891 F.3d 959, 967 (11th Cir. 2018); *see Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518-19 (11th Cir. 1988) (noting "circumstantial evidence and reasonable inferences drawn therefrom [can] create a genuine issue of material fact").

The maps themselves and their computer-generated annotations are admissible as machine-generated statements. *See, e.g.*, *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109-10 (9th Cir. 2015) (map from Google Earth with labels provided by Google "isn't hearsay"); *cf. United States v. Lamons*, 532 F.3d 1251, 1263 (11th Cir. 2008) ("statements of machines" not subject to hearsay rule). Indeed, courts in this Circuit and across the country have held that information obtained from platforms such as Mapcarta and Google Earth are judicially noticeable, meaning that the jury would be instructed to accept the label as "conclusive." Fed. R. Evid. 201(f).[6]

The label on Seaboard's map is corroborated, moreover, by another piece of record evidence. TCM's contract with Seaboard includes its address on the very first page. D.E. 199-12 at 3. That address corresponds to the address on TCM's public website, which includes an embedded link to Google Maps, showing its offices' location and giving their precise coordinates, 23°00'01.0"N 82°46'47.6"W.

---

[6] *See United States v. Julius*, 14 F.4th 752, 756 (7th Cir. 2021) ("We and other courts have taken judicial notice of distance estimates from Google Maps."); *United States v. Vega-Rivera*, 866 F.3d 14, 19 n.3 (1st Cir. 2017) (taking judicial notice of Google Maps); *United States v. Burroughs*, 810 F.3d 833, 835 n.1 (D.C. Cir. 2016) (same); *Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (*sua sponte* judicial notice of Google Maps); *United States v. Perea-Rey*, 680 F.3d 1179, 1182 n. 1 (9th Cir. 2012) ("We take judicial notice of a Google map . . . ."); *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1320 n.14 (N.D. Ga. 2017) (same); *Ferguson v. Destefano*, No. 10-cv-80385, 2010 WL 11561136, at *5 n.6 (S.D. Fla. Oct. 6, 2010), *report and recommendation adopted*, 2010 WL 11561178 (S.D. Fla. Oct. 29, 2010) (taking judicial notice of "geographical locations and boundaries" shown on Google Maps).

*See* TC Mariel, *available at* https://www.tcmariel.cu/?lang=en.    There was accordingly ample evidence from which a jury could find that Seaboard trafficked by engaging in commercial activity "using or benefiting from" TCM's office on confiscated land.

### B.    Seaboard Trafficked in Azucarera's Property Because it Contracted With Traffickers

There was yet another way that Seaboard's conduct constituted trafficking. The evidence showed that the terminal's operator, TCM, and Seaboard's shipping agent, Taina, each traffic in Azucarera's property.    It is undisputed that Seaboard relied on both.    Seaboard contracted with TCM to transfer its containers to trucks or railway cars for transport inland.    D.E. 199-12 at 37 (§ 1(c)).    And it contracted with Taina to "arrange" that "inland haulage."    D.E. 199-6 at 4 (§ 3(b)(iv)).    A jury could thus find that Seaboard trafficked by "caus[ing], direct[ing], participat[ing] in, or profit[ing] from, trafficking" by TCM and Taina.    22 U.S.C. § 6023(13)(A)(iii).

TCM traffics in Azucarera's land in at least two ways relevant here.    First, TCM "operates and manages the Container Terminal of Mariel."    D.E. 199-12 at 3. TCM's responsibility for the entire terminal necessarily includes the portion on Azucarera's land.    D.E. 268 at 34.    TCM thus traffics by "manag[ing]" confiscated property.    22 U.S.C. § 6023(13)(A)(i).    Seaboard, in turn, traffics by "participat[ing] in" TCM's trafficking through the parties' contractual relationship.    *Id.* § 6023(13)(A)(iii); *see Havana Docks Corp. v. Carnival Corp.*, ___ F. Supp. 3d

____, 2022 WL 831160, at *46 (S.D. Fla. 2022) (cruise line "traffics" by "entering into agreements with Cuban entities" that manage confiscated property).

Second, TCM is in the business of transferring containers from ships to trucks and railcars at the terminal for transport inland. *See, e.g.*, D.E. 199-12 at 37 (§ 1(c)). The district court acknowledged there was evidence that Ms. de Fernandez had a claim "to the area surrounding the naval air station." D.E. 268 at 25; *see* D.E. 178-27 at 6 & fig. 4 (maps showing location of confiscated land). That meant there was evidence from which a jury could find that the only way inland was through confiscated property. Whether the terminal was on confiscated land or not, then, TCM's business relied on access to and transit through that land. TCM thus traffics by "engag[ing] in a commercial activity using or otherwise benefiting from confiscated property." 22 U.S.C. § 6023(13)(A)(ii). Seaboard, in turn, traffics by "direct[ing]" or "profit[ing] from" TCM's ability to transfer cargo for inland haulage. *Id.* § 6023(13)(A)(iii).

Taina's business likewise relies on the ability to access and transit through Azucarera's confiscated land. Taina "arrange[s] inland haulage" for cargo brought to the terminal. D.E. 199-6 at 4 (§ 3(b)(iv)). Taina could not offer that service without Azucarera's permission if the Castro regime had not confiscated the land surrounding the container terminal. Taina thus traffics by "engag[ing] in a commercial activity using or otherwise benefiting from confiscated property." 22

U.S.C. § 6023(13)(A)(ii).  Seaboard, in turn, traffics by "direct[ing]" or "profit[ing] from" Taina's trafficking.  *Id.* § 6023(13)(A)(iii).

The district court disagreed.  It held that Seaboard could not be liable based on its relationship with TCM because there was "no evidence" that Seaboard asked TCM to perform any services under the contract or that TCM did so.  D.E. 268 at 34-35.  That holding was based on a clause stating that TCM "'will provide [Seaboard] with the Terminal Services included'" in a separate appendix "'and other services . . . which may be demanded by'" Seaboard, which the court interpreted to mean the contract was "conditional."  D.E. 268 at 35 (emphasis omitted).  That is wrong.[7]

The plain text of the contract makes clear that only the "*other* services"—*i.e.*, those ***not*** listed in the contract's appendix—are conditional.  D.E. 199-12 at 8 (§ 2.1) (emphasis added).  TCM unambiguously committed that it "***will provide*** the Terminal Services" that ***were*** listed.  D.E. 199-12 at 8 (§ 2.1) (emphasis added); *see, e.g.*, D.E. 199-12 at 37 (§ 1) (TCM "shall provide" certain services).

---

[7] The court also suggested that the claim of indirect trafficking set forth a "new theory of liability" not pled in the amended complaint.  D.E. 268 at 34.  That is incorrect.  The amended complaint alleged that Seaboard had trafficked "***either*** directly ***or*** by causing, directing, participating in, or profiting from trafficking by or through one or more other persons."  D.E. 45 at 24 (¶ 91) (emphasis added); *see also* D.E. 45 at 29 (¶ 107) (same); D.E. 45 at 27 (¶ 102(d)) (alleging that Seaboard is "profiting or otherwise benefiting from trafficking in the Confiscated Property by or through others").

Regardless, Ms. de Fernandez was entitled to an inference that TCM had, in fact, "discharg[ed]" Seaboard's containers from its ships and "mount[ed]" them to "truck[s] or rail car[s]." D.E. 199-12 at 37 (§ 1(c)); *see Brady*, 33 F.4th at 1281 (courts at summary judgment must draw "all reasonable inferences in the light most favorable to the non-moving party"). It was undisputed that, during the term of its contract with TCM, Seaboard sent ship after ship to the terminal, loaded with frozen chicken parts. D.E. 268 at 5; D.E. 199-12 (contract showing May 2019 execution). It is implausible that those parts remained on Seaboard's ships, let alone at the terminal.

The district court made the same mistake in its discussion of Seaboard's contract with Taina. It saw no evidence that Seaboard "activated" such "conditional clauses" as Taina's undertaking to "arrange inland haulage" of Seaboard's containers "as required." D.E. 268 at 30; D.E. 199-6 at 4 (§ 3(b)(iv)). Again, though, Seaboard's repeated trips to Mariel compel the inference that Taina did, in fact, "arrange inland haulage" and did not simply leave the frozen chicken on the pier. The district court's contrary ruling should be reversed.[8]

---

[8] The district court also found no evidence that "Taina fulfilled its duties" on confiscated land. D.E. 268 at 30-31. Again, trafficking does not require activity on the confiscated land. *See* pp. 35-37, *supra*.

### III.    Title III's Bar Date Does Not Apply to Rights Subject to Probate or to Rights Passed by Inheritance

To "eliminate any incentive that might otherwise exist" for foreigners "to transfer claims to confiscated property to U.S. nationals in order to take advantage of the remedy created by" the Act, Title III bars actions based on claims acquired after the Act's effective date of March 12, 1996.  H.R. Rep. No. 104-202, at 40 (1995).  The Act provides that

> In the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996.

22 U.S.C. § 6082(a)(4)(B).

It is undisputed that all five Blanco Rosell siblings acquired their claims to the confiscated property at issue here long before that cutoff date.  D.E. 66 at 16.  Because four of the siblings died while the right to bring an action under Title III remained suspended by executive fiat, their claims were asserted in this action by the personal representatives of their estates.

The district court dismissed the estate plaintiffs.  D.E. 66 at 16-17.  It reasoned that the estates "acquired" the claims asserted here when the late siblings died.  D.E. 66 at 16.  Because each died after 1996, the court held that their estates acquired those claims too late.  D.E. 66 at 15-16.  That holding cannot stand scrutiny.

No one—not the estates, their personal representatives, or the siblings' heirs—"acquired" the claims asserted here upon the siblings' deaths. Under Florida law, those claims will remain the ***siblings'*** property until the probate process is complete. Even if the claims had passed to the late siblings' heirs, reading the statute to bar their claims would expand the bar date's effect far beyond the narrow concern it was meant to address. The district court's contrary holdings undermine the statute's purposes and raise serious separation-of-powers concerns.

Standard of Review. The Court reviews questions of statutory interpretation *de novo*. *Pemco Aeroplex*, 195 F.3d at 1236.

## A. The Late Blanco Rosell Siblings' Estates Did Not "Acquire" The Siblings' Claims

The district court assumed without analysis that the late Blanco Rosell siblings' estates "acquired" the siblings' claims to confiscated property. D.E. 66 at 15-16. It accordingly rejected the argument that "the estates and personal representatives 'stepped into the shoes' of the decedents." D.E. 66 at 16. That was error. Florida law could not be clearer: Estates do not acquire property, and a decedent's "personal representative simply 'stands in [the decedent's] shoes.'" *Sullivan*, 80 So. 2d at 707; *see Magwood v. Tate*, 835 So. 2d 1241, 1243 (Fla. Dist. Ct. App. 2003) ("[I]t is essential to understand that the estate stands in the shoes of [the decedent].").

   1.    *Under Florida Law, An Estate Does Not "Acquire" Property in the Sense that Term is Used in the Helms-Burton Act*

The Helms-Burton Act does not define "acquire."  That term accordingly carries its "plain and ordinary meaning."  *Spencer v. Specialty Foundry Prods. Inc.*, 953 F.3d 735, 740 (11th Cir. 2020).  To determine the ordinary meaning of undefined statutory terms, this Court "often look[s] to dictionary definitions for guidance."  *Id.* (quoting *In re Walter Energy, Inc.*, 911 F.3d 1121, 1143 (11th Cir. 2018)).  In this case, the definitions in "both popular and legal" dictionaries share a common thread. *Id.*  To "acquire" something means to get it ***as one's own***.[9]

The ordinary meaning of "acquire" is dispositive here.  Under Florida law, estates do not and cannot "acquire" property or anything else in the sense that word is used in the Helms-Burton Act.  *See Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law.").  An estate is not an entity or person capable of having

---

[9] At the time Title III was enacted in 1996, popular and legal dictionaries defined "acquire" in similar ways.  *See* Acquire, Oxford English Dictionary (2d ed. 1989) ("To gain, obtain, or ***get as one's own***, to gain the ownership of (by one's own exertions or qualities)" or "[t]o receive, or get as one's own (without reference to the manner), to come into possession of") (emphasis added); Acquire, Black's Law Dictionary (6th ed. 1990) ("To gain by any means, usually by one's own exertions; to ***get as one's own***; to obtain by search, endeavor, investment, practice, or purchase; receive or gain in whatever manner; come to have.") (emphasis added). Contemporary dictionaries concur.  *See, e.g.*, Acquire, Webster's New World College Dictionary (4th ed. 2004) (to "***come to have as one's own***") (emphasis added).

anything as its "own."  Rather, an "estate" is simply "the property of a decedent that is the subject of administration."  Fla. Stat. § 731.201(14); *cf. id.* § 731.201(32) ("Property" includes "causes of action of the estate and causes of action the decedent had at the time of death").  It is, in other words, a legal fiction that describes the status of assets that have yet to be distributed.

Estates are administered by a "personal representative," who takes "possession or control" of "the decedent's property."  Fla. Stat. § 733.607(1).  But the personal representative does not "gain ownership of" or "get" that property as their "own."  The "estate assets are ***not*** the personal representative's property."  *State v. Lahurd*, 632 So. 2d 1101, 1103 (Fla. Dist. Ct. App. 1994) (emphasis added).  And while the personal representative has the authority to assert the decedent's rights in court, the representative merely "'stands in [the decedent's] shoes.'"  *Sullivan*, 80 So. 2d at 707.

Nor do heirs automatically "acquire" property upon the decedent's death.  Although an heir's interest in the decedent's property "vests" on death, the transfer to the heir of title is "subject to the administration of the estate."  *In re Estate of Slater*, 437 So. 2d 1110, 1112 (Fla. Dist. Ct. App. 1983).  That is, an heir may gain equitable title the moment the decedent dies and a contingent interest even before that, but the heir does not "acquire" the property—come to have it as her own—within the plain meaning of the Helms-Burton Act.

2.     *The District Court Misconstrued Florida Estate Law*

The district court rested its contrary holding on two Florida decisions, neither one of which supports dismissal.  The first case, *Sharps v. Sharps*, 214 So. 2d 492 (Fla. Dist. Ct. App. 1968), involved an action brought by an estate's executor to recover a check the decedent received before he died, but which his wife deposited in her own account soon after he died.  *Id*. at 493-94.

The *Sharps* court did ***not*** hold, as the district court assumed, that the estate "acquired" the check upon the husband's death.  Just the opposite.  The court explained that, unless the wife could prove that her husband "had made a gift of the check to her," it remained ***his property*** and thus "became an asset of the husband's estate" upon his death.  *Sharps*, 214 So. 2d at 495; *see id.* (noting that "the wife still held ***the husband's*** check" when he died) (emphasis added).  That is entirely consistent with the statute's definition of an estate as "the property of a decedent." Fla. Stat. § 731.201(14).

The second decision, *Depriest v. Greeson*, 213 So. 3d 1022 (Fla. Dist. Ct. App. 2017), is no more supportive.  That case involved a lawsuit filed against an estate and its personal representative for damages the plaintiff sustained when the decedent's daughter crashed his car soon after he died.  *Depriest*, 213 So. 3d at 1025. The court explained that "[a]lthough the [father's] car was an asset of the estate, it did not belong to anyone individually."  *Id.* at 1025.

The district court took that to mean that the late Blanco Rosell siblings' assets had become property of their estates and "no longer belonged to them individually." D.E. 66 at 16. That is not what *Depriest* says. By statute, the car—and every other asset of the estate—was "the property of a decedent that is the subject of administration." Fla. Stat. § 731.201(14). The issue before the court in *Depriest* was accordingly not whether the ***decedent*** owned the car. Rather, the issue was whether the car "belong[ed] to" the decedent's ***son or daughter***. The court held that it belonged to neither because the car remained "subject to administration." *Depriest*, 213 So. 3d at 1025 (citing Fla. Stat. § 731.201(14)). "Ultimate ownership" would thus not be determined until the conclusion of the probate process. *Id.* at 1026.

There was accordingly no basis in the Helms-Burton Act or Florida law to bar the estates' personal representatives from standing in the late siblings' shoes to litigate this action.

### B.    Alternatively, the Heirs of the Late Blanco Rosell Siblings May Sue

This Court is poised to decide whether inheritance counts as "acquisition" within the meaning of the Helms-Burton Act. *See Mario Del Valle, et al., v. Trivago GMBH, et al*., No. 20-12407 (argued Oct. 4, 2021), *Javier Garcia-Bengochea v. Carnival Corporation*, No. 20-12960 (argued Oct. 4, 2021), and *Javier Garcia-Bengochea v. Royal Caribbean Cruises*, *LTD*., No. 20-14251 (argued Oct. 4, 2021). In the event the Court holds it does not, Appellants respectfully request that the Court

53

vacate the dismissal of the heirs' claims and remand so that they can replead those claims on remand.  Appellants briefed this issue in the district court and preserved it for appeal.

### C.    Barring the Claims of Estates and Heirs Would Undercut Title III's Purpose and Raise Serious Separation-of-Powers Concerns

The bar date was meant to "eliminate any incentive that might otherwise exist" for foreigners "to transfer claims to confiscated property to U.S. nationals in order to take advantage of the remedy created by" the Act.  H.R. Rep. No. 104-202, at 40 (1995).  That purpose is not served by preventing the estate and heirs of U.S. nationals who acquired their claims well before the bar date from asserting those claims under Title III.  Indeed, it undercuts Congress's stated intention to offer "fully effective remedies for the wrongful confiscation of property and for unjust enrichment from the use of wrongfully confiscated property" and to "deny traffickers any profits from economically exploiting Castro's wrongful seizures."  22 U.S.C. § 6081(8), (11).

Giving effect to Congress's purposes here is important for another reason, too. Congress gave the President discretion to *suspend* Title III's private right of action, but it sharply constrained the President's authority to *extinguish* that right of action. Thus, the President may suspend Title III for six months at a time if he "determines" that doing so "is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba."  22 U.S.C. § 6085(c)(1)(B); *see id.*

§ 6064(a).  But he may not terminate the right of action unless he determines that a democratically elected government has taken power in Cuba.  *Id*. § 6082(h)(1)(B).

Interpreting the bar date to apply to estates and heirs of Castro's victims would upend the balance Congress struck.  It would allow the Executive Branch effectively to extinguish Title III by attrition.  Indeed, it has nearly done so already.  Until President Trump, successive presidential administrations had "suspended" the right to bring an action under Title III for some *23 years*.  Unsurprisingly, the revolution's immediate victims—exiled in the 1960s—have entered old age in that time.  Many have died.  Congress cannot have intended the bar date and suspension authority, working together, to allow the President to circumvent the restrictions it placed on his authority to terminate Title III's right of action.

## CONCLUSION

The district court's judgment should be reversed, and the case remanded for further proceedings.

November 16, 2022

Respectfully submitted,

/s/ Eugene A. Sokoloff

David A. Baron
Melvin White
Laina C. Lopez
Dale B. Eppler
Jared R. Butcher
BERLINER CORCORAN & ROWE, LLP
1101 17th Street, N.W., Ste. 1100
Washington, D.C.  20036
(202) 293-1074

John S. Gaebe
LAW OFFICES OF JOHN S. GAEBE P.A.
5870 SW 96 St.
Miami, Florida  33156
(305) 607-4755

Eugene A. Sokoloff
  *Counsel of Record*
Kenneth E. Notter III
MOLO LAMKEN LLP
300 N. LaSalle Street
Chicago, IL  60654
(312) 639-8410
esokoloff@mololamken.com

Martin Cunniff
FIELDS PLLC
1701 Pennsylvania Ave, N.W., Ste. 200
Washington, D.C.  20006
(833) 382-9816

William R. Boeringer
William B. Milliken
HORR, NOVAK & SKIPP, P.A.
Two Datran Center, Ste. 1700
9130 S. Dadeland Boulevard
Miami, Florida  33156
(305) 670-2525

*Counsel for Appellants*

# STATUTORY ADDENDUM

**22 U.S.C. § 6023**

As used in this chapter, the following terms have the following meanings:

### (1) Agency or instrumentality of a foreign state

The term "agency or instrumentality of a foreign state" has the meaning given that term in section 1603(b) of Title 28.

### (2) Appropriate congressional committees

The term "appropriate congressional committees" means the Committee on International Relations and the Committee on Appropriations of the House of Representatives and the Committee on Foreign Relations and the Committee on Appropriations of the Senate.

### (3) Commercial activity

The term "commercial activity" has the meaning given that term in section 1603(d) of Title 28.

### (4) Confiscated

As used in subchapters I and III, the term "confiscated" refers to--

> **(A)** the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959--
>
> > **(i)** without the property having been returned or adequate and effective compensation provided; or
> >
> > **(ii)** without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure; and

**(B)** the repudiation by the Cuban Government of, the default by the Cuban Government on, or the failure of the Cuban Government to pay, on or after January 1, 1959--

> **(i)** a debt of any enterprise which has been nationalized, expropriated, or otherwise taken by the Cuban Government;
>
> **(ii)** a debt which is a charge on property nationalized, expropriated, or otherwise taken by the Cuban Government; or
>
> **(iii)** a debt which was incurred by the Cuban Government in satisfaction or settlement of a confiscated property claim.

## (5) Cuban Government

**(A)** The term "Cuban Government" includes the government of any political subdivision of Cuba, and any agency or instrumentality of the Government of Cuba.

**(B)** For purposes of subparagraph (A), the term "agency or instrumentality of the Government of Cuba" means an agency or instrumentality of a foreign state as defined in section 1603(b) of Title 28, with each reference in such section to "a foreign state" deemed to be a reference to "Cuba".

## (6) Democratically elected government in Cuba

The term "democratically elected government in Cuba" means a government determined by the President to have met the requirements of section 6066 of this title.

## (7) Economic embargo of Cuba

The term "economic embargo of Cuba" refers to--

> **(A)** the economic embargo (including all restrictions on trade or transactions with, and travel to or from, Cuba, and all restrictions on transactions in property in which Cuba or nationals of Cuba have an interest) that was imposed against Cuba pursuant to section 2370(a) of this title, section 4305(b) of Title 50, the Cuban Democracy Act of 1992 (22 U.S.C. 6001 and following), or any other provision of law; and

**(B)** the restrictions imposed by section 902(c) of the Food Security Act of 1985.

**(8) Foreign national**

The term "foreign national" means--

**(A)** an alien; or

**(B)** any corporation, trust, partnership, or other juridical entity not organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States.

**(9) Knowingly**

The term "knowingly" means with knowledge or having reason to know.

**(10) Official of the Cuban Government or the ruling political party in Cuba**

The term "official of the Cuban Government or the ruling political party in Cuba" refers to any member of the Council of Ministers, Council of State, central committee of the Communist Party of Cuba, or the Politburo of Cuba, or their equivalents.

**(11) Person**

The term "person" means any person or entity, including any agency or instrumentality of a foreign state.

**(12) Property**

**(A)** The term "property" means any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest.

**(B)** For purposes of subchapter III of this chapter, the term "property" does not include real property used for residential purposes unless, as of March 12, 1996--

>   **(i)** the claim to the property is held by a United States national and the claim has been certified under title V of the International Claims Settlement Act of 1949; or

>   **(ii)** the property is occupied by an official of the Cuban Government or the ruling political party in Cuba.

**(13) Traffics**

**(A)** As used in subchapter III, and except as provided in subparagraph (B), a person "traffics" in confiscated property if that person knowingly and intentionally--

>   **(i)** sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

>   **(ii)** engages in a commercial activity using or otherwise benefiting from confiscated property, or

>   **(iii)** causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

>   without the authorization of any United States national who holds a claim to the property.

**(B)** The term "traffics" does not include--

>   **(i)** the delivery of international telecommunication signals to Cuba;

>   **(ii)** the trading or holding of securities publicly traded or held, unless the trading is with or by a person determined by the Secretary of the Treasury to be a specially designated national;

**(iii)** transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel; or

**(iv)** transactions and uses of property by a person who is both a citizen of Cuba and a resident of Cuba, and who is not an official of the Cuban Government or the ruling political party in Cuba.

## (14) Transition government in Cuba

The term "transition government in Cuba" means a government that the President determines is a transition government consistent with the requirements and factors set forth in section 6065 of this title.

## (15) United States national

The term "United States national" means--

**(A)** any United States citizen; or

**(B)** any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States.

**22 U.S.C. § 6082**

**(a) Civil remedy**

**(1) Liability for trafficking**

**(A)** Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this subchapter, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages in an amount equal to the sum of--

**(i)** the amount which is the greater of—

**(I)** the amount, if any, certified to the claimant by the Foreign Claims Settlement Commission under the International Claims Settlement Act of 1949, plus interest.

**(II)** the amount determined under section 6083(a)(2) of this title, plus interest; or

**(III)** the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater; and

**(ii)** court costs and reasonable attorneys' fees.

**(B)** Interest under subparagraph (A)(i) shall be at the rate set forth in section 1961 of Title 28, computed by the court from the date of confiscation of the property involved to the date on which the action is brought under this subsection.

**(2) Presumption in favor of the certified claims**

There shall be a presumption that the amount for which a person is liable under clause (i) of paragraph (1)(A) is the amount that is certified as described in subclause (I) of that clause. The presumption shall be rebuttable by clear and convincing evidence that the amount described in subclause (II) or (III) of that clause is the appropriate amount of liability under that clause.

**(3) Increased liability**

**(A)** Any person that traffics in confiscated property for which liability is incurred under paragraph (1) shall, if a United States national owns a claim with respect to that property which was certified by the Foreign Claims Settlement Commission under title V of the International Claims Settlement Act of 1949, be liable for damages computed in accordance with subparagraph (C).

**(B)** If the claimant in an action under this subsection (other than a United States national to whom subparagraph (A) applies) provides, after the end of the 3-month period described in paragraph (1) notice to—

> **(i)** a person against whom the action is to be initiated, or

> **(ii)** a person who is to be joined as a defendant in the action,

> at least 30 days before initiating the action or joining such person as a defendant, as the case may be, and that person, after the end of the 30-day period beginning on the date the notice is provided, traffics in the confiscated property that is the subject of the action, then that person shall be liable to that claimant for damages computed in accordance with subparagraph (C).

**(C)** Damages for which a person is liable under subparagraph (A) or subparagraph (B) are money damages in an amount equal to the sum of—

> **(i)** the amount determined under paragraph (1)(A)(ii), and

> **(ii)** 3 times the amount determined applicable under paragraph (1)(A)(i).

**(D)** Notice to a person under subparagraph (B)--

> **(i)** shall be in writing;

> **(ii)** shall be posted by certified mail or personally delivered to the person; and

**(iii)** shall contain—

**(I)** a statement of intention to commence the action under this section or to join the person as a defendant (as the case may be), together with the reasons therefor;

**(II)** a demand that the unlawful trafficking in the claimant's property cease immediately; and

**(III)** a copy of the summary statement published under paragraph (8).

**(4) Applicability**

**(A)** Except as otherwise provided in this paragraph, actions may be brought under paragraph (1) with respect to property confiscated before, on, or after March 12, 1996.

**(B)** In the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996.

**(C)** In the case of property confiscated on or after March 12, 1996, a United States national who, after the property is confiscated, acquires ownership of a claim to the property by assignment for value, may not bring an action on the claim under this section.

**(5) Treatment of certain actions**

**(A)** In the case of a United States national who was eligible to file a claim with the Foreign Claims Settlement Commission under title V of the International Claims Settlement Act of 1949 but did not so file the claim, that United States national may not bring an action on that claim under this section.

**(B)** In the case of any action brought under this section by a United States national whose underlying claim in the action was timely filed with the Foreign Claims Settlement Commission under title V of the International Claims Settlement Act of 1949 but was denied by the Commission, the court shall accept the findings of the Commission on the claim as conclusive in the action under this section.

**(C)** A United States national, other than a United States national bringing an action under this section on a claim certified under title V of the International Claims Settlement Act of 1949, may not bring an action on a claim under this section before the end of the 2-year period beginning on March 12, 1996.

**(D)** An interest in property for which a United States national has a claim certified under title V of the International Claims Settlement Act of 1949 may not be the subject of a claim in an action under this section by any other person. Any person bringing an action under this section whose claim has not been so certified shall have the burden of establishing for the court that the interest in property that is the subject of the claim is not the subject of a claim so certified.

**(6) Inapplicability of act of state doctrine**

No court of the United States shall decline, based upon the act of state doctrine, to make a determination on the merits in an action brought under paragraph (1).

**(7) Licenses not required**

**(A)** Notwithstanding any other provision of law, an action under this section may be brought and may be settled, and a judgment rendered in such action may be enforced, without obtaining any license or other permission from any agency of the United States, except that this paragraph shall not apply to the execution of a judgment against, or the settlement of actions involving, property blocked under the authorities of section 4305(b) of Title 50, that were being exercised on July 1, 1977, as a result of a national emergency declared by the President before such date, and are being exercised on March 12, 1996.

**(B)** Notwithstanding any other provision of law, and for purposes of this subchapter only, any claim against the Cuban Government shall not be deemed to be an interest in property the transfer of which to a United States national required before March 12, 1996, or requires after March 12, 1996, a license issued by, or the permission of, any agency of the United States.

**(8) Publication by Attorney General**

Not later than 60 days after March 12, 1996, the Attorney General shall prepare and publish in the Federal Register a concise summary of the provisions of this subchapter, including a statement of the liability under this subchapter of a person trafficking in confiscated property, and the remedies available to United States nationals under this subchapter.

**(b) Amount in controversy**

An action may be brought under this section by a United States national only where the amount in controversy exceeds the sum or value of $50,000, exclusive of interest, costs, and attorneys' fees.  In calculating $50,000 for purposes of the preceding sentence, the applicable amount under subclause (I), (II), or (III) of subsection (a)(1)(A)(i) may not be tripled as provided in subsection (a)(3).

**(c) Procedural requirements**

**(1) In general**

Except as provided in this subchapter, the provisions of Title 28 and the rules of the courts of the United States apply to actions under this section to the same extent as such provisions and rules apply to any other action brought under section 1331 of Title 28.

**(2) Service of process**

In an action under this section, service of process on an agency or instrumentality of a foreign state in the conduct of a commercial activity, or against individuals acting under color of law, shall be made in accordance with section 1608 of Title 28.

**(d) Enforceability of judgments against Cuban Government**

In an action brought under this section, any judgment against an agency or instrumentality of the Cuban Government shall not be enforceable against an agency or instrumentality of either a transition government in Cuba or a democratically elected government in Cuba.

**(e) Omitted**

**(f) Election of remedies**

**(1) Election**

Subject to paragraph (2)--

**(A)** any United States national that brings an action under this section may not bring any other civil action or proceeding under the common law, Federal law, or the law of any of the several States, the District of Columbia, or any commonwealth, territory, or possession of the United States, that seeks monetary or nonmonetary compensation by reason of the same subject matter; and

**(B)** any person who brings, under the common law or any provision of law other than this section, a civil action or proceeding for monetary or nonmonetary compensation arising out of a claim for which an action would otherwise be cognizable under this section may not bring an action under this section on that claim.

**(2) Treatment of certified claimants**

**(A)** In the case of any United States national that brings an action under this section based on a claim certified under title V of the International Claims Settlement Act of 1949--

> **(i)** if the recovery in the action is equal to or greater than the amount of the certified claim, the United States national may not receive payment on the claim under any agreement entered into between the United States and Cuba settling claims covered by such title, and such national shall be deemed to have discharged the United States from any further responsibility to represent the United States national with respect to that claim;

> **(ii)** if the recovery in the action is less than the amount of the certified claim, the United States national may receive payment under a claims agreement described in clause (i) but only to the extent of the difference between the amount of the recovery and the amount of the certified claim; and

> **(iii)** if there is no recovery in the action, the United States national may receive payment on the certified claim under a claims agreement

described in clause (i) to the same extent as any certified claimant who does not bring an action under this section.

**(B)** In the event some or all actions brought under this section are consolidated by judicial or other action in such manner as to create a pool of assets available to satisfy the claims in such actions, including a pool of assets in a proceeding in bankruptcy, every claimant whose claim in an action so consolidated was certified by the Foreign Claims Settlement Commission under title V of the International Claims Settlement Act of 1949 shall be entitled to payment in full of its claim from the assets in such pool before any payment is made from the assets in such pool with respect to any claim not so certified.

## (g) Deposit of excess payments by Cuba under claims agreement

Any amounts paid by Cuba under any agreement entered into between the United States and Cuba settling certified claims under title V of the International Claims Settlement Act of 1949 that are in excess of the payments made on such certified claims after the application of subsection (f) shall be deposited into the United States Treasury.

## (h) Termination of rights

### (1) In general

All rights created under this section to bring an action for money damages with respect to property confiscated by the Cuban Government--

**(A)** may be suspended under section 6064(a) of this title; and

**(B)** shall cease upon transmittal to the Congress of a determination of the President under section 6063(c)(3) of this title that a democratically elected government in Cuba is in power.

### (2) Pending suits

The suspension or termination of rights under paragraph (1) shall not affect suits commenced before the date of such suspension or termination (as the case may be), and in all such suits, proceedings shall be had, appeals taken, and judgments rendered in the same manner and with the same effect as if the suspension or termination had not occurred.

**(i) Imposition of filing fees**

The Judicial Conference of the United States shall establish a uniform fee that shall be imposed upon the plaintiff or plaintiffs in each action brought under this section. The fee should be established at a level sufficient to recover the costs to the courts of actions brought under this section. The fee under this subsection is in addition to any other fees imposed under Title 28.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

*Check the appropriate box in section 1, and check the box in section 2.*

**1.    Type-Volume**

☑    This document complies with the word limit of FRAP      32(a)(7)(B)(1) because, excluding the parts of the document exempted by FRAP 32(f) and      11th Cir. R. 32-4      , this document contains      12,844      words.

   **or**

☐    This brief complies with the line limit of FRAP     [insert Rule citation]     because, excluding the parts of the brief exempted by FRAP 32(f) and      [insert applicable Rule citation, if any]      , this brief uses a monospaced typeface and  contains     [state the number of]      lines of text.

**2.    Typeface and Type-Style**

☑    This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

(s) Eugene A. Sokoloff

Attorney for Appellants

Dated: 11/16/2022

Rev.: 12/16

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2022, I caused the foregoing to be mailed to the Clerk of the Court of the United States Court of Appeals for the Eleventh Circuit via FedEx and served the same on all counsel in this matter by email and FedEx.


Dated: November 16, 2022                    _/s/_ Eugene A. Sokoloff
                                             Eugene A. Sokoloff