## No. 22-12966

# In the United States Court of Appeals
# For the Eleventh Circuit

ODETTE BLANCO DE FERNANDEZ, a.k.a. Blanco Rosell,
EMMA RUTH BLANCO, in her personal capacity, and as Personal Representative of
the Estate of Alfredo Blanco Rosell, Jr., HEBE BLANCO MIYARES, in her personal
capacity, and as Personal Representative of the Estate of Byron Blanco Rosell,
SERGIO BLANCO DE LA TORRE, in his personal capacity, and as Administrator Ad
Litem of the Estate of Enrique Blanco Rosell, EDUARDO BLANCO DE LA TORRE, as
Administrator Ad Litem of the Estate of Florentino Blanco Rosell, LIANA MARIA
BLANCO, SUSANNAH VALENTINA BLANCO, LYDIA BLANCO BONAFONTE,
JACQUELINE M. DELGADO, BYRON DIAZ BLANCO, JR., MAGDELENA BLANCO
MONTOTO, FLORENTINO BLANCO DE LA TORRE, JOSEPH E. BUSHMAN,
CARLOS BLANCO DE LA TORRE, GUILLERMO BLANCO DE LA TORRE,
*Plaintiffs-Appellants*,

versus

SEABOARD MARINE LTD.,
*Defendant-Appellee*.

On Appeal from the United States District Court for the
Southern District of Florida, No 20-cv-25176

## SEALED BRIEF OF APPELLEE

MORGAN, LEWIS & BOCKIUS LLP
Robert M. Brochin
Matthew Papkin
600 Brickell Ave., Ste. 1600
Miami, FL 33131

MORGAN, LEWIS & BOCKIUS LLP
William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002
(713) 890-5188

Brian A. Herman
101 Park Ave.
New York, NY 10178

Amanda L. Salz
1111 Pennsylvania Ave., NW
Washington, DC 20004

*Counsel for Appellee, Seaboard Marine Ltd.*

No. 22-12966

*Odette Blanco De Fernandez, et al v. Seaboard Marine Ltd.*

### APPELLEE SEABOARD MARINE LTD.'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee Seaboard Marine Ltd. makes the following disclosure: Seaboard Marine Ltd. is wholly owned by Seaboard Corporation, a publicly traded corporation (NYSE: SEB). Seaboard Corporation has no parent company, and no other publicly held company owns 10% or more of Seaboard Corporation.

Pursuant to 11th Cir. R. 26.1, Appellee Seaboard Marine Ltd. identifies the following interested parties:

- Barakat Law, P.A. (Counsel for Plaintiffs)

  o Issa, Mitchell

- Berliner Corcoran & Rowe LLP (Counsel for Plaintiffs and Appellants)

  o Baron, David A.

  o Butcher, Jared R.

  o Lopez, Laina Catherine Wilk

  o White, Melvin

- Blanco Bonafonte, Lydia (Plaintiff and Appellant)

*Odette Blanco De Fernandez, et al v. Seaboard Marine Ltd.*, No. 22-12966

- Blanco de Fernandez, Odette (née Blanco Rosell) (Plaintiff and Appellant)

- Blanco de la Torre, Carlos (Plaintiff and Appellant)

- Blanco de la Torre, Eduardo, as Administrator Ad Litem of the Estate of Florentino Blanco Rosell (Plaintiff and Appellant)

- Blanco de la Torre, Florentino (Plaintiff and Appellant)

- Blanco de la Torre, Guillermo (Plaintiff and Appellant)

- Blanco Miyares, Hebe, in her personal capacity, and as Personal Representative of the Estate of Byron Blanco Rosell (Plaintiff and Appellant)

- Blanco Montoto, Magdalena (Plaintiff and Appellant)

- Blanco Rosell, Alfredo, Jr., Estate of (Plaintiff and Appellant)

- Blanco Rosell, Byron, Estate of (Plaintiff and Appellant)

- Blanco Rosell, Enrique, Estate of (Plaintiff and Appellant)

- Blanco Rosell, Florentino, Estate of (Plaintiff and Appellant)

- Blanco, Emma Ruth, in her personal capacity, and as Personal Representative of the Estate of Alfredo Blanco Rosell, Jr. (Plaintiff and Appellant)

*Odette Blanco De Fernandez, et al v. Seaboard Marine Ltd.*, No. 22-12966

- Blanco, Liana Maria (Plaintiff and Appellant)

- Blanco, Sergio, in his personal capacity, and as Administrator Ad Litem of the Estate of Enrique Blanco Rosell (Plaintiff and Appellant)

- Blanco, Susannah Valentina (Plaintiff and Appellant)

- Bloom, Beth, U.S. District Court Judge, Southern District of Florida

- Bushman, Joseph E. (Plaintiff and Appellant)

- Cohen, Sarah J. (Prior Counsel for Defendant; and Formerly of Morgan, Lewis & Bockius LLP)

- Delgado, Jacqueline M. (Plaintiff and Appellant)

- Diaz Blanco, Jr., Byron (Plaintiff and Appellant)

- Fields PLLC (Counsel for Plaintiffs and Appellants)
  - Cunniff, Martin F.
  - Fields, Richard W.
  - Han, Edward

- Horr, Novak & Skipp, P.A. (Counsel for Plaintiffs and Appellants)
  - Boeringer, William R.
  - Horr, David J.
  - Milliken, William B.

*Odette Blanco De Fernandez, et al v. Seaboard Marine Ltd.*, No. 22-12966

- Law Offices of John S. Gaebe P.A. (Counsel for Plaintiffs and Appellants)
  - Gaebe, John S.

- Morgan, Lewis & Bockius LLP (Counsel for Defendant and Appellee)
  - Barber, Maureen K.
  - Brochin, Robert M.
  - Gisleson, John K.
  - Herman, Brian A.
  - Hunchuck, Steven N.
  - Lew, Veronica J.
  - Papkin, Matthew M.
  - Peterson, William R.
  - Salz, Amanda L.
  - Stern, Justin
  - Valenstein, Carl A.

- Seaboard Marine, Ltd. (Defendant and Appellee)

Dated: January 30, 2023                    Respectfully submitted,

                                           */s/ William R. Peterson*
                                           _____

*Odette Blanco De Fernandez, et al v. Seaboard Marine Ltd.*, No. 22-12966

Robert M. Brochin
Matthew M. Papkin
MORGAN, LEWIS & BOCKIUS LLP
600 Brickell Avenue, Suite 1600
Miami, FL 33131
T. (305) 415-3000

Brian A. Herman
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
T. (212) 309-6909

William R. Peterson
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5188

Amanda L. Salz
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T. (202) 739-5689

*Counsel for Seaboard Marine, Ltd.*

## STATEMENT REGARDING ORAL ARGUMENT

Given the significance of the issues, Appellee does not oppose oral argument.

# TABLE OF CONTENTS

**Page**

Appellee Seaboard Marine Ltd.'s Certificate of Interested Persons and Corporate Disclosure Statement....................................................................C-1

Table of Authorities ............................................................... vii

Statement of the Issues.............................................................1

Statement of the Case...............................................................2

Summary of the Argument........................................................12

Argument................................................................................14

I.    Shareholders Cannot Assert Claims Based on the Cuban Government's Confiscation of Corporate Property.......................................14

　　A.    The Helms-Burton Act provided former owners of confiscated property with a claim to confiscated property. ................15

　　B.    Plaintiffs do not own a claim to any property allegedly trafficked in. .......................................................................16

　　C.    Shareholders cannot file suit when a corporation suffers an injury.............................................................................16

II.   The District Court Correctly Held that Plaintiffs Failed to Present Evidence that Seaboard Trafficked in Confiscated Property. ......................19

# TABLE OF CONTENTS
(contents)

**Page**

A.  To traffic, a party must knowingly and intentionally use or benefit from property that the Cuban Government confiscated................................................................................................20

B.  Seaboard did not "traffic" in the Concession.....................................22

    1.  The Concession does not cover the Container Terminal. ..............................................................................23

        a.  The plain language of the Concession limits it to the project constructing a terminal on the east side of Mariel Bay. ........................................................23

        b.  Plaintiffs' argument that the Concession would be valueless without rights over the entire Bay is unpreserved and meritless. ............................................26

        c.  Even if the text of the Concession were ambiguous, the uncontroverted evidence of the parties' intent confirms Seaboard's understanding..................................................................28

iii

# TABLE OF CONTENTS
(contents)

**Page**

2.  Even if the Concession covered the entire Bay, Seaboard did not use or benefit from the right to exploit a port facility. ...................................................................31

3.  Plaintiffs submitted no evidence that Seaboard knew or intended that docking its ships used or benefitted from confiscated property. .................................................32

C.  Seaboard did not traffic in land confiscated from Azucarera. ............33

   1.  Seaboard did not engage in commercial activity using confiscated land. ........................................................................33

   2.  Seaboard did not engage in commercial activity benefiting from confiscated land. ............................................36

   3.  Seaboard did not cause, direct, participate in, or profit from trafficking by a third party. ..............................................38

   4.  Plaintiffs submitted no evidence that Seaboard knowingly and intentionally used or benefitted from confiscated property with respect to confiscated land. .............41

III.  Even if Shareholders Could Theoretically Sue for Confiscations of Corporate Property, Plaintiffs Cannot. ..........................................................43

iv

# TABLE OF CONTENTS
(contents)

**Page**

A.    The district court correctly held that the heirs and estates cannot assert claims............................................................43

B.    Ms. Fernandez presented insufficient evidence that she was a shareholder in her family corporations. ..............................................45

    1.    Ms. Fernandez testified that she did not know whether she owned stock in any Cuban corporation. ............................45

    2.    Ms. Fernandez's interrogatory responses do not create a genuine issue of fact.................................................47

    3.    No documents supported Ms. Fernandez.................................48

    4.    No other admissible testimony supports Ms. Fernandez. ................................................................49

IV.    The Uncontroverted Evidence Shows that Seaboard's Activities Were Necessary to the Lawful Travel of Goods to Cuba..............................50

A.    "Lawful travel" includes the travel of goods and vessels. .................50

B.    Seaboard's activities were lawful.........................................................52

C.    Seaboard's use of the Container Terminal was necessary to the lawful travel of the chickens and gift parcels................................53

# TABLE OF CONTENTS
(contents)

Page

    1.    Seaboard's use of the Container Terminal was "necessary" to lawful travel because it was reasonable and appropriate...........................................................................54

    2.    Even under a narrower definition, Seaboard's use of the Container Terminal was "necessary."......................................54

V.    Plaintiffs Failed to Present Evidence of Damages Attributable to the Alleged Trafficking. .......................................................................55

    A.    Plaintiffs' expert erroneously valued nearly 1,400 acres owned by Azucarera, not the land allegedly trafficked in. ................56

    B.    Plaintiffs' expert erroneously valued the projected profits from operating a Container Terminal for decades, rather than the rights allegedly trafficked in..........................................57

Conclusion & Prayer for Relief ..............................................................60

Certificate of Compliance .......................................................................61

Certificate of Service ..............................................................................62

## TABLE OF CITATIONS

**Page(s)**

### CASES

*Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*,

　833 F.3d 1299 (11th Cir. 2016) ............................................................23

*Appleby v. Delaney*,

　271 U.S. 403 (1926)............................................................................28

*Arias-Rosado v. Gonzalez Tirado*,

　111 F. Supp. 2d 96 (D.P.R. 2000) ......................................................45

*Ayestas v. Davis*,

　138 S. Ct. 1080 (2018).......................................................................54

*Baloco v. Drummond Co., Inc.*,

　767 F.3d 1229 (11th Cir. 2014) ..........................................................20

*Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*,

　380 F.3d 1331 (11th Cir. 2004) .....................................................23, 24

*Bissonnette v. LePage Bakeries Park St., LLC*,

　33 F.4th 650 (2d Cir. 2022) ...............................................................51

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*,

　582 F.3d 1227 (11th Cir. 2009) ..........................................................55

# TABLE OF CITATIONS
(continued)

**Page(s)**

*\*BrewFab, LLC v. 3 Delta, Inc.*,

    No. 22-11003, 2022 WL 7214223 (11th Cir. Oct. 13, 2022) .............................28

*\*Celotex Corp. v. Catrett*,

    477 U.S. 317 (1986) .............................................19

*City of Miami Beach v. Ellis*,

    279 So. 2d 335 (Fla. Dist. Ct. App. 1973) ..........................26

*Clark v. Martinez*,

    543 U.S. 371 (2005) .............................................59

*Comcast Corp. v. Behrend*,

    569 U.S. 27 (2013) .............................................55

*Estate of Haselwood v. Bremerton Ice Arena, Inc.*,

    210 P.3d 308 (Wash. 2009) .....................................26

*F. Hoffman-La Roche Ltd. v. Empragran S.A.*,

    542 U.S. 155 (2004) .............................................19

*Fish v. Kobach*,

    840 F.3d 710 (10th Cir. 2016) ...................................54

*\*Flores-Figueroa v. United States*,

    556 U.S. 646 (2009) .............................................21

TABLE OF CITATIONS
(continued)

**Page(s)**

*Gaff v. Fed. Deposit Ins. Corp.*,

814 F.2d 311 (6th Cir. 1987) ..............................................................17

*Garcia v. Pueblo Country Club*,

299 F.3d 1233 (10th Cir. 2002) ...........................................................46

*Garcia-Bengochea v. Carnival Corp.*,

--- F.4th ---, 2023 WL 142368 (11th Cir. 2022)..............................13, 16, 43, 44

*Gilmour v. Gates, McDonald & Co.*,

382 F.3d 1312 (11th Cir. 2004) ...........................................................38

*\*Glen v. Club Mediterranee, S.A.*,

450 F.3d 1251 (11th Cir. 2006) ............................................................12, 15, 16

*Glen v. Trip Advisor LLC*,

529 F. Supp. 3d 316 (D. Del. 2021)......................................................21

*Golan v. FreeEats.com, Inc.*,

930 F.3d 950 (8th Cir. 2019) ...............................................................58

*Gonzales v. Amazon.com, Inc.*,

2020 WL 1169125 (S.D. Fla. Mar. 10, 2020) ....................................21

*Havana Docks Corp. v. Carnival Corp.*,

592 F. Supp. 3d 1088 (S.D. Fla. 2022)..........................................21, 22

# TABLE OF CITATIONS
(continued)

**Page(s)**

*Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys. of City of*

*Detroit*,

50 F.3d 908 (11th Cir. 1995) ..............................................................30

*In re Binghamton Bridge*,

70 U.S. (3 Wall.) 51 (1865) ................................................................27

*In re Deepwater Horizon*,

48 F.4th 378 (5th Cir. 2022) ...............................................................55

*In re: Estate of Alfredo Blanco, Jr.*,

Case No. 2020-005105-CP-02 (Fla. Cir. Ct.) ....................................44

*In re Lonstein*,

950 F.2d 77 (1st Cir. 1991).........................................................45, 46

*Inbesa Am., Inc. v. M/V Anglia*,

134 F.3d 1035 (11th Cir. 1998) .........................................................54

*Jessica Howard Ltd. v. Norfolk S. R.R. Co.*,

316 F.3d 165 (2d Cir. 2003) ..............................................................51

*Johnson v. Johnson*,

725 So. 2d 1209 (Fla. Dist. Ct. App. 1999)..................................29, 30

TABLE OF CITATIONS
(continued)

**Page(s)**

*Leach v. FDIC*.

860 F.2d 1266 (5th Cir. 1988) ........................................................... 17

*Lobo v. Celebrity Cruises, Inc.*,

704 F.3d 882 (11th Cir. 2013) ........................................................... 19

*Macuba v. Deboer*,

193 F.3d 1316 (11th Cir. 1999) ......................................................... 49

*Malone v. U.S. Att'y Gen.*,

858 F. App'x 296 (11th Cir. 2021) ..................................................... 47

*McCulloch v. Maryland*,

17 U.S. 316 (1819) ............................................................................ 54

*McFadden v. United States*,

576 U.S. 186 (2015) ........................................................................... 21

*McFaul v. Valenzuela*,

684 F.3d 564 (5th Cir. 2012) ............................................................. 48

*Murr v. Wisconsin*,

137 S. Ct. 1933 (2017) ....................................................................... 35

*Nicole Gas Prod., Ltd. v. Bowers*,

916 F.3d 566 (6th Cir. 2019) ............................................................. 17

TABLE OF CITATIONS
(continued)

**Page(s)**

*Norelus v. Denny's, Inc.*,

    628 F.3d 1270 (11th Cir. 2010) .......................................................46

*Pahls v. Thomas*,

    718 F.3d 1210 (10th Cir. 2013) .......................................................37

*Pretka v. Kolter City Plaza II, Inc.*,

    608 F.3d 744 (11th Cir. 2010) .........................................................16

*Ray v. Spirit Airlines, Inc.*,

    836 F.3d 1340 (11th Cir. 2016) .......................................................22

*Reider v. Philip Morris USA, Inc.*,

    793 F.3d 1254 (11th Cir. 2015) ..................................................26, 36

*Rice v. Greene*,

    941 So. 2d 1230 (Fla. Dist. Ct. App. 2006) ....................................45

*Rose v. M/V "GULF STREAM FALCON"*,

    186 F.3d 1345 (11th Cir. 1999) .......................................................29

*S. Cal. Fed. Sav. & Loan Ass'n v. United States*,

    422 F.3d 1319 (Fed. Cir. 2005) ..................................................17, 18

*\*St. Louis, I.M. & S. Ry. Co. v. Williams*,

    251 U.S. 63 (1919)..........................................................................58

TABLE OF CITATIONS
(continued)

**Page(s)**

*Stein v. United Artists Corp.*,

   691 F.2d 885 (9th Cir. 1982) ...............................................................18

*Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc. v. Société*

   *Générale, S.A.*,

   577 F. Supp. 3d 295 (S.D.N.Y. Dec. 22, 2021)....................................21

*Superior Laundry Co. v. Rose*,

   137 N.E. 761 (Ind. 1923) .....................................................................58

*Taylor v. Sturgell*,

   553 U.S. 880 (2008)..............................................................................20

*United States v. Alfaro Moncada*,

   607 F.3d 720 (11th Cir. 2010) .............................................................51

*United States v. Burning Breast*,

   8 F.4th 808 (8th Cir. 2021) ..................................................................51

*United States v. Burroughs*,

   810 F.3d 833 (D.C. Cir. 2016)..............................................................37

*United States v. Folk*,

   754 F.3d 905 (11th Cir. 2014) .............................................................51

TABLE OF CITATIONS
(continued)

**Page(s)**

*United States v. NEC Corp.*,

11 F.3d 136 (11th Cir. 1993) .................................................................44

*United States v. Needham*,

604 F.3d 673 (2d Cir. 2010) .................................................................51

*United States v. Pierre-Louis*,

860 F. App'x 625 (11th Cir. 2021) .......................................................51

*United States v. Vargas*,

6 F.4th 616 (5th Cir. 2021) ..................................................................51

*United States v. Vega-Rivera*,

866 F.3d 14 (1st Cir. 2017) ..................................................................37

*United States v. Wiggins*,

784 F. App'x 919 (6th Cir. 2019) .........................................................51

*Yellow Pages Photos, Inc. v. YP, LLC*,

856 F. App'x 846 (11th Cir. 2021) .......................................................28

STATUTES

6 U.S.C. § 1201 ......................................................................................51

18 U.S.C. § 116 ......................................................................................51

*22 U.S.C. § 6023 ..........................................................................*passim*

xiv

TABLE OF CITATIONS
(continued)

**Page(s)**

22 U.S.C. § 6042 .................................................................................51

*22 U.S.C. § 6082 ...........................................................................*passim*

22 U.S.C. § 7202 ..................................................................................2

34 U.S.C. § 30501 ..............................................................................51

42 U.S.C. § 300h-7 ............................................................................51

46 U.S.C. § 70304 ..............................................................................51

49 U.S.C. § 44908 ..............................................................................51

49 U.S.C. § 70101 ..............................................................................51

49 U.S.C. § 70202 ..............................................................................51

Fla. Stat. § 732.514 ...........................................................................45

Fla. Stat. § 733.607 ...........................................................................44

REGULATIONS

15 C.F.R. § 740.12 .............................................................................52

15 C.F.R. § 740.15 .............................................................................53

15 C.F.R. § 740.18 .............................................................................52

*15 C.F.R. § 746.2 ..........................................................................2, 52

OTHER AUTHORITIES

142 Cong. Rec. S1479-04 .............................................................17, 18

# TABLE OF CITATIONS
(continued)

**Page(s)**

Fed. R. Evid. 201 .........................................................................................37

H.R. Rep. No. 104-468, 1996 WL 90487 (1996) ....................................50

JAMES D. COX & THOMAS LEE HAZEN, 3 TREATISE ON THE LAW OF CORPORATIONS

    § 15:2 (3d ed. 2010) ...........................................................................17

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/travel

    .......................................................................................................50

U.S. Department of State, Secretary of State Michael R. Pompeo's Remarks to the

    Press (Apr. 17, 2019), https://2017-2021.state.gov/remarks-to-the-press-

    11/index.html/ ....................................................................................4

## STATEMENT OF THE ISSUES

1.      Whether a shareholder may assert a claim under the Helms-Burton Act for property confiscated from a corporation.

2.      Whether Plaintiffs presented sufficient evidence that Seaboard trafficked in confiscated property, including whether Seaboard knew and intended that the property was confiscated.

3.      Whether Plaintiffs timely acquired a claim to the property, including:

   a.      whether heirs and estates can assert a Helms-Burton claim based on ownership of claims they allegedly acquired after 1996;

   b.      whether Ms. Fernandez presented sufficient evidence that she was a shareholder in her family's corporations.

4.      Whether Seaboard's activities were incident to the lawful travel of chicken and gift parcels to Cuba.

5.      Whether Plaintiffs presented sufficient evidence of damages.

## STATEMENT OF THE CASE

Appellee Seaboard Marine Ltd. ("Seaboard") is an ocean transportation company based in Florida. D.E. 180-3 at 92. Seaboard transports goods from ports in the United States to countries in South America, Central America, and the Caribbean. D.E. 180-2 at 20.

In 2018, Seaboard was approached by Boston Agrex, a shipper of poultry, about transporting frozen chicken to the Port of Mariel in Cuba. D.E. 180-3 at 33–36. Seaboard knew that another ocean transportation company—Crowley Maritime—had transported goods from the United States to the Port of Mariel since 2015. D.E. 183-5 at SEABOARDMARINE_ESI_027727.

To ensure that its shipments complied with the law, Seaboard consulted outside counsel. D.E. 180-3 at 168–69; D.E. 180-1 at 41–42. In 2000, the Trade Sanctions Reform and Export Enhancement Act terminated all agricultural sanctions against Cuba, 22 U.S.C. § 7202, and Export Administration Regulations were revised to authorize the export of agricultural products to Cuba without a license ("License Exception AGR"), 15 C.F.R. § 746.2(a)(1)(xii). These regulations also authorize exportation of gift parcels and humanitarian donations to Cuba without a license ("License Exception GFT"). *Id.* § 746.2(a)(1)(viii). Outside counsel for Seaboard confirmed that transporting frozen chicken to Cuba would be authorized under License Exception AGR. D.E. 218-1.

2

Starting in May 2019, Seaboard began transporting frozen chicken in refrigerated containers to a container terminal on the west side of the Bay of Mariel (the "Container Terminal").  D.E. 180-3 at 33–36, 54–55, 148, 180.  On two shipments, Seaboard also carried gift parcels for Cuban citizens donated by individuals in the United States and shipped by Florida-based companies Mayabe Express Corp. and Aparicio Cargo Express.  D.E. 183-1; 183-4.

Seaboard's role in transporting chickens and gift parcels ended at the water's edge, the docks of the Container Terminal.  D.E. 180-2 at 94; D.E. 180-3 at 52.  Seaboard did not unload the containers or take any other actions to transport the chicken or gift parcels inland.  D.E. 180-2 at 94; D.E. 180-3 at 14.  Maritima Taina, Seaboard's port agent, was responsible for coordinating logistics with Cuban authorities.  D.E. 180-3 at 50.  In these deliveries, Seaboard's employees remained on the ship and did not set foot on Cuban property.  D.E. 182-8 at 54.

### *Plaintiffs Threaten to Sue Seaboard*

In September 2020, Seaboard received a notice of intent from Plaintiffs.  The letter threatened Seaboard under the Helms-Burton Act.  Title III provides a private right of action for United States nationals against persons who traffic in—i.e., "knowingly and intentionally" use or benefit from—property confiscated by the Cuban Government.  22 U.S.C. § 6082(a)(1)(A).

For "property confiscated before March 12, 1996," the United States national bringing a claim must have "acquire[d] ownership of the claim before March 12, 1996." *Id.* § 6082(a)(4)(B). "Trafficking" excludes any "uses of property incident to lawful travel to Cuba to the extent that such transactions and uses of property are necessary to the conduct of such travel." *Id.* § 6023(13)(B)(iii).

Although the statute was enacted more than three decades ago, the private right of action only recently took effect. Congress allowed the President to suspend the private right of action, and it was suspended every six months until May 2, 2019. *See* U.S. Department of State, Secretary of State Michael R. Pompeo's Remarks to the Press (Apr. 17, 2019), https://2017-2021.state.gov/remarks-to-the-press-11/index.html/.

Plaintiffs' letter vaguely accused Seaboard of "trafficking in property that was confiscated by the Cuban Government." D.E. 183-6 at SEABOARDMARINE_ESI_011265. The letter did not identify any particular property allegedly once owned by Plaintiffs; nor did the letter accuse Seaboard of "trafficking" in any concession (or other intangible rights).

After receiving the letter, Seaboard investigated and determined that the Container Terminal—the Cuban property where Seaboard docked and the only Cuban property with which Seaboard interacted—was not built on land confiscated by the Cuban Government. D.E. 180-3 at 169. The Container Terminal rests instead

4

on land purchased by the Cuban Government prior to the Cuban Revolution and on landfill deposited after the Cuban Revolution. *Id.*; D.E. 184-1 at 208; D.E. 184-6 at 16.

### Plaintiffs Sue Seaboard and Seek Billions of Dollars in Damages

Nonetheless, in December 2020, Plaintiffs filed suit against Seaboard. D.E. 1. Plaintiffs are Odette Blanco de Fernandez née Blanco Rosell ("Ms. Fernandez"), the estates of her four deceased brothers (Alfredo Jr., Florentino, Enrique, and Byron), and thirteen heirs of her brothers. D.E. 180-4 at 11–12.[1]

Ms. Fernandez and her brothers lived in Cuba at the time of the Cuban Revolution. Plaintiffs allege that the Blanco Rosell family owned two companies—Azucarera Mariel S.A ("Azucarera") and Maritima Mariel S.A. ("Maritima")—which were confiscated by the Cuban Government in 1960. D.E. 45 ¶¶ 4–5. No documentary evidence shows that Ms. Fernandez owned these companies.

Plaintiffs allege that the Cuban Government confiscated property from these companies. From Azucarera, they allege confiscation of 11,000 acres of land somewhere near the Bay of Mariel (for reasons not clear to Seaboard, Plaintiffs seek to recover the value of 1,385 acres within these 11,000 acres).

From Maritima, Plaintiffs allege confiscation of "concession rights" to operate a port in the Bay of Mariel. In the early 1900s, a member of the Balsinde

---

[1] Ms. Fernandez also had a sister, Marie Hebe.

family (no relation to Plaintiffs) built a dock next to the town of Mariel (which is located on the east side of the Bay of Mariel). D.E. 181-1, Ex. A at 20. In 1934, the Cuban Government granted a private concession (Decree No. 1655) acknowledging the legality of the private use of that town dock (the "1934 Concession") to Compania Central San Ramon, a Cuban company. *Id.* at 21; D.E. 181-7. The 1934 Concession describes the location of the "dock and warehouses" as "Punta Coco Solo." D.E. 181-1, Ex. A at 21; D.E. 181-7.

The father of the Blanco Rosell siblings, Alfredo Blanco Calas Sr., purchased Central San Ramon in 1949. D.E. 180-5 at 79. In 1955, Maritima applied for and obtained a concession ("the Concession") to expand the dock and warehouse facilities that were the subject of the 1934 Concession (i.e., the dock and warehouse located near the town of Mariel on the east side of the Bay) into a maritime terminal for public use. D.E. 63-1 at 4; *id.* at 8 (¶ 10). The picture below shows the Bay of Mariel, with the Container Terminal on the left (west) side and town docks that were the subject of the Concession on the right (east) side:



D.E. 184-5 at 77.

After the Concession was granted, the Cuban Government—without any objection by Maritima—granted a concession to another entity to operate docks in the Bay of Mariel.  D.E. 181-1, Ex. A at 19, 28.

In this litigation, Plaintiffs misread the Concession.  They allege that it gave Maritima exclusive monopoly power to build and operate any maritime facilities anywhere in the entire Bay of Mariel.  Appellants' Br. 21–22.

Plaintiffs have demanded staggering amounts of money.  Each Blanco Rosell sibling was, at most, a minority shareholder in Maritima and Azucarera.  D.E. 45 ¶ 4.  But Plaintiffs insist that Ms. Fernandez (and, one supposes, every other heir and estate of every minority shareholder) could personally recover three times the entire

fair market value of 1,385 acres of land allegedly confiscated from Azucarera—not just the land allegedly trafficked in—plus the full value of operating the Container Terminal for decades.  D.E. 180-6 at 13–14; D.E. 183-8; D.E. 183-10.  Plaintiffs' experts claimed that those properties are worth up to an astounding $**5 billion before trebling**.  D.E. 183-8 ¶ 3; D.E. 183-10 ¶ 68.

In addition, Plaintiffs have filed five other Title III lawsuits seeking to collect the value of the same property from other defendants.  In Plaintiffs' interpretation of the Helms-Burton Act, any company that delivers even a single shipment to the Container Terminal owes billions of dollars to every estate or heir of every minority shareholder in Maritima and Azucarera.

### *The District Court Dismisses Some Claims and Grants Summary Judgment on Others*

Following a motion to dismiss by Seaboard, D.E. 52, the district court dismissed the claims of the estates and heirs because they did not acquire claims to confiscated property before March 12, 1996, D.E. 66 at 14–16.  Only Ms. Fernandez's claim continued.

Seaboard moved for summary judgment on six independent grounds:  (1) Ms. Fernandez did not present admissible evidence that she owned Azucarera or Maritima; (2) a minority shareholder of a Cuban company cannot assert a Helms-Burton Act claim based on confiscation of assets that were owned by the company; (3) Seaboard did not traffic in any land or concession rights confiscated by the Cuban

8

Government; (4) Seaboard did not "knowingly and intentionally" traffic in confiscated property because it did not know or have reason to know of confiscated land or concession rights; (5) Ms. Fernandez presented no competent evidence of damages; and (6) Seaboard's use of the Container Terminal was necessary and incident to the lawful travel of its chickens and gift parcels to Cuba. D.E. 177.

The district court rejected two arguments. It found a genuine issue of material fact with regard to Ms. Fernandez's ownership based on her testimony that she received annual "dividends" and that her "family" owned certain properties. D.E. 268 at 10. It further held that a minority shareholder can assert a claim based on assets confiscated from a Cuban company. *Id.* at 10–11.

The district court agreed, however, that Ms. Fernandez presented insufficient evidence that Seaboard trafficked in the Concession or confiscated land. The Concession unambiguously applied only to the town docks on the east side of Mariel Bay—where Maritima applied to construct a maritime facility—and not to the Container Terminal. *Id.* at 20–21.

As to trafficking in land, there was no evidence that the empty container storage facility or the office of the entity that operates the Container Terminal—Terminal de Contenedores de Mariel S.A. ("TCM")—sat on confiscated land. *Id.* at 25, 31 n.20. The uncontroverted evidence showed that Seaboard's empty containers were stored on land that was not confiscated. *Id.* at 25.

9

In its Order, the Court provided a map showing the Container Terminal on property that was never confiscated and across the Bay from the area where Maritima applied to build (and built) a maritime facility:



D.E. 268 at 26.

The district court granted summary judgment and did not reach Seaboard's remaining arguments.

10

This appeal followed.  D.E. 271.

## SUMMARY OF THE ARGUMENT

The district court correctly granted summary judgment because Plaintiffs presented no evidence that Seaboard trafficked in confiscated property. The district court correctly interpreted the Concession, correctly held that Plaintiffs presented no evidence that Seaboard used or benefitted from confiscated land, and correctly held that Seaboard did not traffic through a third party. If this Court reaches these issues, it can readily affirm based on the reasoning below.

But there is a more straightforward ground of decision: Plaintiffs admit that they did not own the confiscated property at issue. They instead accuse Seaboard of trafficking in property confiscated from Cuban corporations. *E.g.*, Appellants' Br 22 ("trafficked in Maritima's property"). The corporations, not Plaintiffs, thus "ow[n] the claim to [confiscated] property." 22 U.S.C. § 6082(a)(1)(A); *see also Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006) (interpreting the phrase). Minority shareholders—like Plaintiffs—cannot sue when corporations have been injured. This principle forecloses Plaintiffs' claims.

There are also numerous alternative grounds for affirmance. First, in addition to the deficiencies in Plaintiffs' trafficking evidence identified by the district court, Plaintiffs failed to present evidence that Seaboard "knowingly and intentionally" used or benefitted from confiscated property.

12

Second, even if minority shareholders could, in theory, sue for injuries to a corporation, Plaintiffs cannot. Ms. Fernandez presented no admissible evidence that she was an owner of either corporation. And the heirs did not "acquir[e] ownership of the claim [to confiscated property] before March 12, 1996." 22 U.S.C. § 6082(a)(4)(B); *Garcia-Bengochea v. Carnival Corp.*, --- F.4th ---, 2023 WL 142368, at *10 (11th Cir. 2022). This limit on when a claim must be acquired cannot be evaded by filing suit in the names of estates.

Third, Seaboard showed as a matter of law that its activities did not constitute "trafficking" because they were necessary to the lawful travel of chickens and gift parcels to Cuba. 22 U.S.C. § 6023(13)(B)(iii).

Fourth, Plaintiffs failed to present evidence of damages tied to their liability theory. They accuse Seaboard of trafficking in (a) small pieces of land and (b) on specific occasions, in deliveries to the Container Terminal. But their damages experts erroneously valued (a) 1,385 acres that were not even allegedly trafficked in and (b) the right to operate the Container Terminal for 30 years. Summary judgment was proper because Plaintiffs presented no evidence of damages.

Each of these grounds, independently, requires affirmance.

13

**ARGUMENT**

## I. Shareholders Cannot Assert Claims Based on the Cuban Government's Confiscation of Corporate Property.

The most straightforward ground for affirmance rests on the plain text of the statute. The Helms-Burton Act provides a cause of action only for United States nationals who were former owners of property confiscated by the Cuban Government. 22 U.S.C. § 6082(a)(1)(A) ("any United States national who owns the claim to such property [confiscated by the Cuban Government]").

Plaintiffs did not own any confiscated property allegedly trafficked in by Seaboard. The confiscated property was allegedly owned by their corporations: Azucarera and Maritima. *See, e.g.*, Appellants' Br. 21–22 ("[T]he exclusive right to exploit a port facility in the Bay belonged to the Blanco Rosell siblings' confiscated company, Maritima Mariel. Seaboard thus trafficked in Maritima's property[.]"); *id.* at 32 ("Seaboard also trafficked in land held by another company confiscated from the Blanco Rosell siblings, Azucarera Mariel."). These corporations, not Plaintiffs, thus "ow[n] a claim to [confiscated] property" allegedly trafficked in, and Plaintiffs cannot sue.

Nothing in the Helms-Burton Act overrides the background principle that a shareholder cannot file suit for injury to a corporation. This Court can affirm the grant of summary judgment on this ground.

14

**A.    The Helms-Burton Act provided former owners of confiscated property with a claim to confiscated property.**

The Helms-Burton Act allows suit by a plaintiff who "owns the claim to such [confiscated] property."    22 U.S.C. § 6082(a)(1)(A).    The district court's interpretation of the phrase was inconsistent with this Court's precedent.  As a matter of international and domestic law, the Cuban government is now the "owner" of confiscated property.  *Glen*, 450 F.3d at 1255.  "While the [Helms-Burton Act] condemns these confiscations as 'wrongful,' it does not proclaim them ineffective." *Id.*  The Helms-Burton Act provided the former owners with a new property interest: a "claim to [confiscated] property."  *See id.* ("The Helms–Burton Act refers to the property interest that former owners of confiscated property now have as ownership of a 'claim to such property.'").

In other words, the only ways to own a "claim to confiscated property" are to have: (1) owned property confiscated by the Cuban Government; or (2) acquired this property interest from another person.

The district court erroneously interpreted "claim" to extend the rights beyond former owners.  D.E. 268 at 11.  The district court reasoned that interpreting only former owners to possess claims "would require the Court to delete the word 'claim' from the phrase 'owns the claim to such property,' and to effectively rewrite the Act to cover only those plaintiffs who 'own such property.'" *Id.* at 10–11.

15

The district court's reasoning directly conflicts with *Glen v. Club Mediterranee*. Congress could not have used the phrase "own such property" because the "owner" of the property is the Cuban Government. 450 F.3d at 1255. The phrase "owns the claim to such property" simply refers to the right now possessed by former owners (or acquired from them)—it does not broaden the potential plaintiffs.[2]

### B.    Plaintiffs do not own a claim to any property allegedly trafficked in.

Application of these principles is straightforward. Plaintiffs admit that the real property at issue and the Concession were owned by Azucarera and Maritima. Appellants' Br. 21–22, 32. Because Plaintiffs did not own the confiscated property (and did not acquire a claim to this confiscated property from the former owners), they do not "ow[n] the claim to [confiscated] property." 22 U.S.C. § 6082(a)(1)(A); *Glen*, 450 F.3d at 1255.

### C.    Shareholders cannot file suit when a corporation suffers an injury.

Nothing in the Helms-Burton Act overrides the principle that shareholders cannot sue personally for injury to a corporation. "Congress legislates against the backdrop of established principles of state and federal common law." *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 758 (11th Cir. 2010) (quotation omitted).

---

[2] *Garcia-Bengochea*, 2023 WL 142368, does not discuss whether shareholders own a claim to property confiscated from a corporation.

16

These background principles include the rule that shareholders cannot sue for injuries to a corporation. The Fifth Circuit discussed the principles of corporate injury and shareholder claims in *Leach v. FDIC*. 860 F.2d 1266, 1269 (5th Cir. 1988) (distinguishing "between persons who have suffered injury which the law treats as 'corporate' injury and persons who have suffered injury which the law treats as 'personal' to the person"). These rules apply regularly in a variety of contexts.[3]

Nothing in the Helms-Burton Act departs from these background principles. If a defendant traffics in property confiscated from a corporation, the corporation— the owner of the claim to the confiscated property—can file suit.

Legislative history confirms that Congress contemplated that corporations— not shareholders—would file suit for confiscation of corporate property. *See* 142 Cong. Rec. S1479-04, at S1481 (Mar. 5, 1996) ("The Castro regime offers the sale of the Hermanos Diaz Refinery in Santiago, Cuba. Its rightful owner, however, Mr. President, is Texaco."); *id.* at S1480 ("We have concluded that there are only about

---

[3] *E.g.*, *Nicole Gas Prod., Ltd. v. Bowers*, 916 F.3d 566, 569 (6th Cir. 2019) ("When an artificial entity (a corporation) is injured, shareholders cannot necessarily redress that injury themselves."); *S. Cal. Fed. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1332 (Fed. Cir. 2005) ("This court has regularly acknowledged the legal distinction between a corporation and its shareholders and rejected claims by shareholders[.]"); *Gaff v. Fed. Deposit Ins. Corp.*, 814 F.2d 311, 315 (6th Cir. 1987) ("[A] shareholder of a corporation does not have a personal or individual right of action for damages based solely on an injury to the corporation."); *see also* JAMES D. COX & THOMAS LEE HAZEN, 3 TREATISE ON THE LAW OF CORPORATIONS § 15:2 (3d ed. 2010).

17

700 claims, principally commercial interests, that would therefore come under the act."). Nothing in the legislative history suggests that shareholders could sue for confiscated corporate property.

Congress acted reasonably in not overriding these principles: "If shareholders were permitted to recover their losses directly, there would be the possibility of a double recovery, once by the shareholder and again by the corporation." *Stein v. United Artists Corp.*, 691 F.2d 885, 896–97 (9th Cir. 1982); *see also S. Cal. Fed. Sav. & Loan Ass'n*, 422 F.3d at 1332 (noting the risk of "an impermissible double recovery"). This is hardly speculative: Despite allegedly owning only a 20% share in the corporations, Ms. Fernandez insisted below that she (and every other shareholder) could personally recover the entire current fair market value of the property at issue. D.E. 180-6 at 13–14; D.E. 183-8; D.E. 183-10.

Consider Chevron Texaco, the rightful owner of the Hermanos Diaz Refinery. 142 Cong. Rec. S1479-04, at S1481 (Mar. 5, 1996). It would be absurd to suggest that every individual Texaco shareholder could file suit for confiscation of Texaco's property (much less, as Plaintiffs demand, each separately recover its full value).

It was reasonable for Congress not to provide a remedy for confiscations of property from Cuban corporations. The Helms-Burton Act is concerned with the effect of the confiscations on Americans: Congress provided a right for United States nationals who own claims to confiscated property. Courts "assume that legislators

18

take account of the legitimate sovereign interests of other nations when they write American laws." *F. Hoffman-La Roche Ltd. v. Empragran S.A.*, 542 U.S. 155, 164 (2004). Statutes are not construed "to extend to disputes between foreign parties where the United States maintains no interest." *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 889 (11th Cir. 2013). Congress could reasonably conclude that the Cuban Government confiscating property from a Cuban corporation is an internal act for which United States law should not provide a remedy.[4]

*    *    *

Plaintiffs admit that Azucarera and Maritima owned the property allegedly trafficked. These corporations—not Plaintiffs—thus "own a claim to such property." Summary judgment should be affirmed on this basis.

## II. The District Court Correctly Held that Plaintiffs Failed to Present Evidence that Seaboard Trafficked in Confiscated Property.

Even if Plaintiffs owned a claim to property confiscated from Azucarera and Maritima, the district court correctly granted summary judgment on the ground that there was insufficient evidence that Seaboard trafficked in confiscated property.[5] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[4] Indeed, permitting shareholders to file suit would circumvent Congress's decision to limit the cause of action to U.S. nationals. A Cuban corporation could not sue for confiscation of its property because the Cuban corporation is not a "U.S. national."

[5] Even if the estates were proper plaintiffs and should not have been dismissed, this Court can affirm the judgment against them based on these arguments because they

The district court correctly found that there was no evidence Seaboard engaged in commercial activity using or benefitting from (either directly or through another) either the Concession or any land owned by Azucarera.  In addition, Plaintiffs presented no evidence that Seaboard did so knowingly and intentionally, as the statute requires.

### A.    To traffic, a party must knowingly and intentionally use or benefit from property that the Cuban Government confiscated.

As relevant here, Title III of the Helms-Burton Act provides:

[A] person "traffics" in confiscated property if that person **knowingly** and **intentionally**—

. . .[6]

> (ii)    engages in a commercial activity using or otherwise benefiting from confiscated property, or

> (iii)   causes, directs, participates in, or profits from, trafficking . . . by another person, or otherwise engages in trafficking . . . through another person,

22 U.S.C. § 6023(13) (emphases added).  The "knowingly and intentionally" requirement limits liability to defendants who knew that the property was confiscated and intended to use or benefit from property that is confiscated.

In discussing a similar scienter requirement, the Supreme Court has held that as a matter of ordinary English grammar, "it seems natural to read the statute's word

---

are in privity with Ms. Fernandez.  *E.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 892–94 (2008); *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1249–51 (11th Cir. 2014).

[6] Plaintiffs do not assert that Seaboard trafficked under 22 U.S.C. § 6023(13)(A)(i).

'knowingly' as applying to all the subsequently listed elements." *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009). "If we say that someone knowingly ate a sandwich with cheese, we normally assume that the person knew both that he was eating a sandwich and that it contained cheese." *Id.* at 651; *see also McFadden v. United States*, 576 U.S. 186, 191 (2015) ("[T]he word 'knowingly' applies not just to the statute's verbs but also to the object of those verbs—'a controlled substance.'").

To "knowingly and intentionally engag[e] in a commercial activity using or otherwise benefiting from confiscated property," a defendant must know and intend both that the defendant was engaging in commercial activity using or benefitting from property and that the property was confiscated by the Cuban Government. Several district court decisions have followed this common-sense reading.[7] This Court should do the same.

---

[7] *See Gonzales v. Amazon.com, Inc.*, 2020 WL 1169125, at *2 (S.D. Fla. Mar. 10, 2020) (dismissing claim because the complaint "does not demonstrate that the Defendants knew the property was confiscated by the Cuban government"); *Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc. v. Société Générale, S.A.*, 577 F. Supp. 3d 295, 311 (S.D.N.Y. Dec. 22, 2021) (holding the "defendant must at least have had reason to know that the property in which it allegedly trafficked was confiscated by the Cuban government"); *Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316, 331 (D. Del. 2021) (holding that "traffics" "require[s] that Defendants know that the Subjects Hotels sit on confiscated properties").

In a different case, the district court's discussion of the knowledge element was ambiguous, although it appears to recognize that the requirement "applies . . . to trafficking acts." *Havana Docks Corp. v. Carnival Corp.*, 592 F. Supp. 3d 1088,

21

Because "a corporation cannot act except through its officers, agents, and employees," *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016), Plaintiffs would need to prove that a particular employee or agent of Seaboard had the requisite knowledge and intent.

### B.    Seaboard did not "traffic" in the Concession.

Plaintiffs contend that Seaboard trafficked in Maritima's right "to exploit port facilities in Mariel Bay."  Appellants' Br. 36, 47.  The district court correctly held that the Concession unambiguously granted Maritima rights only over a single terminal at a specified location on the east side of Mariel Bay, not exclusive rights over the entire Bay.  The only extrinsic evidence confirms this understanding.

Even if the Concession applied to the entire Bay, Seaboard did not engage in commercial activity using or otherwise benefiting from the right "to exploit port facilities in Mariel Bay" by transporting chicken and gift parcels to a dock.

At a minimum, Plaintiffs cannot show that Seaboard knew that the Concession was confiscated property and thus intentionally used or benefitted from confiscated property.

---

1160 (S.D. Fla. 2022).  *Compare id.* at 1158 (noting that defendants "gain[ed] actual knowledge of the Certified Claim"), *with id.* at 1158–59 ("Defendants did not use the Terminal by mistake or accident").

22

### 1.     The Concession does not cover the Container Terminal.

The district court correctly interpreted the Concession not to give Maritima rights over the Container Terminal.

### a.     The plain language of the Concession limits it to the project constructing a terminal on the east side of Mariel Bay.

The meaning of an unambiguous contract is a matter of law. A contract is ambiguous only when a term "is susceptible to two or more reasonable interpretations that can be fairly made." *Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1307 (11th Cir. 2016). Plaintiffs are incorrect to suggest that a jury should decide the scope of the Concession "[i]f there could be any doubt as to [its] scope." Appellants' Br. 32. To the contrary, "[a] simple disagreement between the parties as to the meaning of contractual terms . . . does not render a contract ambiguous." *Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*, 380 F.3d 1331, 1335 (11th Cir. 2004). The only reasonable interpretation of the Concession is that it applies to a particular project on the east side of Mariel Bay, not the entire Bay.

Part One states that "a concession is granted to 'Maritima Mariel, S. A.' to plan, study, execute, maintain, and exploit public docks and warehouses **in** the Bay of Mariel." D.E. 63-1 at 4 (§ 1) (emphasis added). The Concession does not state that it grants rights over the "entire Bay of Mariel" or "whole Bay of Mariel."

23

The next paragraph specifies where "in the Bay of Mariel" the conferred rights apply: the location in the "maps filed by [Maritima] with the National Financing Agency of Cuba." *Id.* It specifies that Maritima was permitted to construct "**a** Maritime Terminal" at that location, not "terminal**s**" plural. *Id.* (emphasis added).

Part Fifteen also refers to the "construction project" and "the property of what shall become the concession," (D.E. 63-1 at 9 (§ 15)), further confirming the Concession concerned a single construction project in a single property. Plaintiffs' interpretation—that the entire Bay would become the Concession—cannot be harmonized with Part Fifteen.

Other provisions are consistent. Part Three states that Maritima "could" apply to "obtain a public utility concession . . . for the study, planning, execution, operation, and exploitation" of maritime facilities in other areas of the Bay. D.E. 63-1 at 7. If the Concession already granted Maritima rights to execute, operate, and exploit maritime facilities throughout the entire Bay, then the statement that Maritima "could" apply would be superfluous.

Plaintiffs identify no provision that undermines this plain reading. Plaintiffs rely on the statement that the concession rights were granted "without detriment to the vested rights of third parties and entities by virtue of previous and current concessions for the same goals as those expressed in the paragraph herein" (D.E. 63-1 at 4 (§ 1)), arguing that this statement would be meaningless unless Maritima was

24

granted the right to build maritime facilities throughout the entire Bay. Appellants' Br. 25. Not so. There were numerous potential conflicts between Maritima's rights to build and operate a terminal on the east side of Mariel Bay and the rights of other concessionaires. For example, the Concession granted the right to impose an easement on third parties' property to build underground electric lines for the terminal. D.E. 63-1 at 5 (§ 2(c)). The Concession made Maritima's easement rights subject to those of other concessionaires.

Plaintiffs are also wrong to suggest that the conditions imposed on Maritima (such as beginning and completing construction of the terminal within a designated time) must mean that the Concession granted rights to the entire Bay. Appellants' Br. 27–28. The Concession—although limited to the existing project on the east side of Mariel Bay—still conveyed valuable rights to Maritima, allowing it to expand its dock and convert it from private to public use. D.E. 63-1 at 8 (§ 10). In exchange for that right, it is reasonable that the Cuban Government would impose requirements on Maritima.

Finally, Plaintiffs argue that because some parts relate to the construction project and others refer to Maritima's obligations as a concessionaire, the Concession must apply to the entire Bay. Appellants' Br. 41. That makes no sense. That the geographic scope of the Concession is not repeated with each reference to Maritima's obligations or rights as a concessionaire does not demonstrate that its

scope is unlimited.  The Concession authorizes Maritima to, for example, "record th[e] concession in the Property Record's Office."  D.E. 63-1 at 7 (§ 6).  That provision does not expand the geographic scope of the Concession.

> **b.    Plaintiffs' argument that the Concession would be valueless without rights over the entire Bay is unpreserved and meritless.**

On appeal, Plaintiffs argue that the Concession must have given Maritima rights over the entire Bay because it would otherwise be worthless.  Appellants' Br. 26–27.  The argument is forfeited because it was not raised before the district court.  *E.g.*, *Reider v. Philip Morris USA, Inc.*, 793 F.3d 1254, 1258 (11th Cir. 2015).

Even if Plaintiffs had preserved the argument, it is meritless.  The purpose of a concession agreement is to allow a private entity to operate a public facility (contingent on building the facility or other investments).  *E.g.*, *City of Miami Beach v. Ellis*, 279 So. 2d 335, 336–37 (Fla. Dist. Ct. App. 1973); *Estate of Haselwood v. Bremerton Ice Arena, Inc.*, 210 P.3d 308, 310 (Wash. 2009).  Plaintiffs' expert defined a "concession agreement" as "a long-term lease of port facilities involving the requirement that the concessionaire undertakes capital investments to build, expand, or maintain the cargo-handling facilities equipment and infrastructure."  D.E. 182-2 at 213–19.  The benefit to the concessionaire is the right to operate the specific port facility, not monopoly power over all ports in a geographic area.

26

Plaintiffs' assertion (at 27) that competing port facilities in the Bay would render the Concession valueless is unsupported by record evidence. Plaintiffs cite (at 27) to Jean-Paul Rodrigue's rebuttal expert report, but the cited portion merely opines that the location of the Concession was not coterminous with the 1934 Concession because that location would have required dredging to accommodate standard maritime ships in the 1950s. D.E. 178-30 at 1. The report says nothing about whether the Concession would have value if the Cuban Government could authorize ports on the west side of Mariel Bay.

Plaintiffs' argument contradicts the testimony of their own damages expert, who valued a concession to operate the Container Terminal on the west side of the Bay at approximately $800 million, despite the presence of other maritime facilities in the Bay.

Plaintiffs also ignore the existence of at least five preexisting concessions to other entities to build or operate docks in the Bay of Mariel, including one for public use. D.E. 181-1, Ex. A at 18–19. If the presence of other maritime facilities in the Bay truly rendered the Concession valueless, then it was worthless from the start.

Plaintiffs cannot rely on cases to substitute for the absence of evidence. *See* Appellants' Br. 27 (discussing *In re Binghamton Bridge*, 70 U.S. (3 Wall.) 51 (1865), which involved a right to bridge over Susquehanna River granted by State of New York). That different rights granted at different times by different

27

governments to different parties might have been valueless if they were not exclusive does nothing to prove that the Concession was worthless unless it gave Maritima a monopoly over the entire Bay. And Plaintiffs' argument based on *Appleby v. Delaney*, 271 U.S. 403 (1926), simply begs the question, assuming the correctness of their interpretation of the Concession. Unlike in *Appleby*, Plaintiffs make no attempt to show any reliance on their monopoly-over-the-entire-bay interpretation.

> **c.     Even if the text of the Concession were ambiguous, the uncontroverted evidence of the parties' intent confirms Seaboard's understanding.**

Plaintiffs are incorrect to argue that if the Concession were ambiguous, its meaning must be determined by a jury. Like other questions of fact, the meaning of an ambiguous contract can be decided on summary judgment "when the ambiguity can be resolved by undisputed parol evidence of the parties' intent." *BrewFab, LLC v. 3 Delta, Inc.*, No. 22-11003, 2022 WL 7214223, at *3 (11th Cir. Oct. 13, 2022) (quoting *Waveblast Watersports II Inc. v. UH-pompano, LLC*, 291 So. 3d 657, 661 (Fla. Dist. Ct. App. 2020)); *accord Yellow Pages Photos, Inc. v. YP, LLC*, 856 F. App'x 846, 859 (11th Cir. 2021).

Here, the only evidence of the parties' intent shows that the Cuban Government and Maritima intended the Concession to apply only to the maritime facility on the east side of the Bay.

28

First, the "'whereas' clause[s]" are "evidence of the parties' intent." *E.g.*, *Rose v. M/V "GULF STREAM FALCON"*, 186 F.3d 1345, 1350 (11th Cir. 1999) (noting that such clauses may not override unambiguous operative provisions but "may be evidence of parties' intent"); *Johnson v. Johnson*, 725 So. 2d 1209, 1213 (Fla. Dist. Ct. App. 1999) ("[C]ourts may resort to the language of recital clauses if the operative provisions are ambiguous."). The "whereas" clauses show that Maritima requested and was granted a concession to build a single maritime terminal. The first clause makes clear that it concerns "[Maritima's] property":

> Having seen the file processed by the Nacional Financing Agency of Cuba with regard to the applications made and projects submitted by 'Maritima Mariel, S.A.' for the financing of an authorization for the construction of different works such as walls, docks, warehouses, dredging, fillings-in, and others **in the low lands and mangroves of its property** . . . .

D.E. 63-1 at 2 (emphasis added). The Concession was granted in response to Maritima's application to construct a terminal on "its property."

The sixth "whereas" clause further confirms the scope of the concession Maritima requested: Maritima "ask[ed] for a concession for the construction of **said docks and warehouses**, dredging and improvement of the maritime-terrestrial zone that shall need a partial filling-in." *Id.* at 3 (emphasis added). In granting the Concession, the Cuban Government granted Maritima rights "to build said docks and warehouses" on "its property"—not docks and warehouses throughout the entire Bay. *Id.* at 3–4.

29

And another clause recites that Maritima "requested . . . to be authorized to convert to public use the dock and warehouse . . . which were legalized and authorized for private use by Presidential Decree No. 1655 [the 1934 Concession]." *Id.* at 4. The 1934 Concession, in turn, describes the location of the "dock and warehouses" as "Punta Coco Solo," *id.*, a location on the east side of the Bay. D.E. 181-8 at DIAZ_000521; D.E. 181-1, Ex. A at 19–21.

Third, the conduct of Maritima and the Cuban Government confirms that the parties did not intend to grant rights over the entire Bay. "[W]hen a contract term is ambiguous, the best evidence of the parties' intent is the construction the parties themselves put on the agreement through their conduct." *Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 919 (11th Cir. 1995). Here, just three years after the Concession, the Cuban Government granted a concession and provided funding to a different company to construct and operate a shipyard and docks in the Bay. D.E. 181-1, Ex. A at 19, 28. There is no evidence that Maritima objected (or otherwise complained) that the Cuban Government violated Maritima's supposed exclusive rights over the entire Bay. The parties' conduct unambiguously demonstrates that the Cuban Government and Maritima did not interpret the Concession as giving exclusive rights over all of the Bay.

30

Fourth, the annual report of the Financiera Board of Directors—a Cuban Government agency that processed concession applications—confirms the scope of the Concession. According to this report, Maritima submitted requests "to obtain [a] concession of public works for the construction and exploitation of **a** Maritime Terminal in the Port of Mariel." D.E. 181-9, at DIAZ_000293 (emphasis added).

Even if the Concession's text were ambiguous, the uncontroverted evidence of the parties' intent demonstrates that the Cuban Government and Maritima intended the Concession to grant rights only in the east side of the Bay, not over the entire Bay. Because the Concession did not extend to the Container Terminal, summary judgment was proper.

### 2. Even if the Concession covered the entire Bay, Seaboard did not use or benefit from the right to exploit a port facility.

Even if the Concession covered the entire Bay, Plaintiffs' theory would still fail. Plaintiffs contend that Seaboard engaged in commercial activity that used or benefited from "the exclusive right to exploit a port facility in the Bay." Appellants' Br. 22.

But Seaboard did not "exploit a port facility." Plaintiffs do not argue that the Concession gave Maritima Mariel the exclusive right to transport goods to the Bay or dock ships. Nor would that have made any sense—Maritima applied to convert its docks to public use so that **other** entities could ship there. Even under Plaintiffs' interpretation, Maritima was granted the exclusive right to operate a port, not the

31

right to ship goods to that port.  By transporting goods to the Container Terminal, Seaboard did not use or benefit from "the exclusive right to exploit a port facility in the Bay."  *Id.*  Thus, even if Plaintiffs' interpretation were correct, Seaboard did not traffic in the Concession.

### 3. Plaintiffs submitted no evidence that Seaboard knew or intended that docking its ships used or benefitted from confiscated property.

Moreover, even if the Concession applied to the Container Terminal and docking a ship used "the exclusive right to exploit a port facility," *id.*, Plaintiffs provided no evidence that Seaboard knew that docking at the Container Terminal related to the Concession (or even that the Concession existed).

No document or other record gave Seaboard—or anyone else—notice that docking at the Container Terminal involved confiscated concession rights.  There is no evidence, for example, that one would identify the Concession by searching Cuban public records relating to the Container Terminal.  Plaintiffs' notice letter did not even mention the Concession or any concession rights at all; it merely generally stated that they claimed to "own claims to property and rights and interests in property including in the ports, docks, warehouses and land at the port of Mariel." D.E. 183-6 at SEABOARDMARINE_ESI_011266.

Any uncertainties about the scope of the Concession further weigh against Plaintiffs.  "[D]oubt as to the [C]oncession's scope" does not, as Plaintiffs suggest

32

(at 32), mean that the case should go to a jury—it means that Seaboard did not "knowingly and intentionally" use or benefit from the Concession. Even if this Court were to disagree with the district court's interpretation, summary judgment on the Concession should be affirmed based on the absence of knowledge and intent.

### C.    Seaboard did not traffic in land confiscated from Azucarera.

Plaintiffs contend that Seaboard used and benefitted from land confiscated from Azucarera when Seaboard delivered chicken and gift parcels to a dock that is (admittedly) located on unconfiscated land.

Plaintiffs also argue that Seaboard trafficked through the acts of separate entities Terminal de Contenedores de Mariel S.A. ("TCM") and Taina.[8] The district court correctly rejected both arguments and granted summary judgment. This Court can also affirm because there is no evidence Seaboard knew and intended that it was using or benefitting from confiscated land.

#### 1.    Seaboard did not engage in commercial activity using confiscated land.

It is undisputed that the area where Seaboard docked its vessels was not confiscated. Appellants' Br. 34–35. And there is no evidence Seaboard's containers were stored in a container yard on land that was confiscated. D.E. 180-3 at 52. There

---

[8] Plaintiffs do not contend that Seaboard trafficked in confiscated land under 22 U.S.C. § 6023(13)(A)(i). Appellants' Br. 33.

33

is thus no evidence that Seaboard engaged in commercial activity using confiscated land.

Nevertheless, Plaintiffs contend that "the district court should have treated the terminal as a single property" and thus that using any area of the terminal constitutes trafficking in the entire Container Terminal complex.  Appellants' Br. 38.

Plaintiffs' "single property" theory conflicts with the statute.  To be liable, a defendant must "traffi[c] in property . . . confiscated by the Cuban Government."  22 U.S.C. § 6082(a)(1)(A).  Because the portion of the Container Terminal used by Seaboard was not property confiscated by the Cuban Government, Seaboard could not be liable.  Plaintiffs' "single property" theory, which would impose liability for using property not confiscated by the Cuban Government, cannot be harmonized with the statute's plain text.

Plaintiffs' hypotheticals pose no challenge.  For example, Plaintiffs contend it would be "absurd" if "a business that rented space in a building set in part on confiscated land [could] avoid liability by directing its employees to walk only on a certain side of a hallway."  Appellants' Br. 39.  But there is nothing absurd about treating a business that rents space and operates on confiscated property differently from one that does not: Under the statute's plain text, there would be no Title III liability absent evidence that the business engaged in commercial activity using or otherwise benefiting from the confiscated land.  And even if all of a building built

34

partly on confiscated property might be considered to "use" confiscated property, such a conclusion would not justify treating the entire Container Terminal—a large facility with multiple buildings—as a single property. The dock "used" by Seaboard does not sit, even partially, on confiscated land, and Plaintiffs submitted no evidence that Seaboard's activities on unconfiscated property (i.e., docking) somehow used or benefitted from confiscated property.

*Murr v. Wisconsin*, 137 S. Ct. 1933 (2017), does not support Plaintiffs. In *Murr*, the Supreme Court treated a landowner's adjacent lots as a single parcel in analyzing whether a regulatory taking occurred by comparing the value of the property taken with the value of the remaining property. *Id.* at 1943–44. Here, Plaintiffs ask the Court to treat unconfiscated property as part of confiscated property for the purpose of a statute that punishes trafficking in confiscated property. The Helms-Burton Act governs what constitutes trafficking in confiscated property, not the multifactor takings test of *Murr*.

Plaintiffs' argument depends on at least a portion of the Container Terminal sitting on confiscated property. But no evidence supports this assumption: Plaintiffs' cartography expert testified that the Container Terminal sits on land that the Cuban Government purchased from the Balsinde family and partially on later-added landfill. D.E. 184-1 at 208–10. There is no evidence to the contrary.

35

### 2. Seaboard did not engage in commercial activity benefiting from confiscated land.

As an alternative, Plaintiffs contend that Seaboard trafficked in the land because it engaged in commercial activity benefitting from a TCM office located on confiscated property. 22 U.S.C. § 6023(13)(A)(ii). As an initial matter, there is no evidence that anything occurred at a TCM office, much less anything that Seaboard's commercial activity used or otherwise benefited from. That ends the analysis. Seaboard did not "traffic" in a TCM office.

In addition, as the district court correctly held, there is no evidence that a TCM office was located on confiscated land. D.E. 268 at 31 n.20. Plaintiffs' contrary argument is meritless.

Plaintiffs ask this Court to take judicial notice of Google Maps and a website that purportedly identifies the geographic coordinates of the office. Appellants' Br. 43. Plaintiffs forfeited this argument by not raising it before the district court. *Reider*, 793 F.3d at 1258. There was no request for the district court to take judicial notice of these maps, and having failed to make this argument on summary judgment, Plaintiffs cannot now rely on it on appeal.

Indeed, when Plaintiffs attempted to raise this argument below through an untimely expert report, the district court struck the report as untimely and refused to consider it. D.E. 256 at 6–9. Plaintiffs show no abuse of discretion in this procedural ruling.

36

Even if Plaintiffs' request were preserved, it is meritless. Courts have recognized Google Maps as a "sourc[e] whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), only for "determin[ing] the 'general location' of relevant events." *Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (quotation omitted); *see, e.g.*, *United States v. Burroughs*, 810 F.3d 833, 835 n.1 (D.C. Cir. 2016) ("identifying the area . . . and the general layout of the block"); *United States v. Vega-Rivera*, 866 F.3d 14, 19 & n.3 (1st Cir. 2017) (whether a chase took place in "an active business area near several restaurants, fast-food spots, bars, and a clinical laboratory"). We have identified no case—Plaintiffs cite none— suggesting that Google Maps is a "sourc[e] whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2), for the purpose of precisely demarcating property boundaries and whether a specific building is located within a specific tract of real property. Nor have Plaintiffs cited a case holding that juries can draw inferences about precise property boundaries based on small-scape maps like those Plaintiffs rely on.

Plaintiffs also argue that "Seaboard's business in Cuba depended on its ability to deliver containers to a facility where they could be removed from its vessels and placed on trucks or railcars for transit inland" and that, because the Container Terminal "sits partly" on confiscated land, Seaboard engaged in commercial activity using or otherwise benefiting from confiscated land. Appellants' Br. 36. As

discussed in Section II.C.3, *infra*, there is no evidence that any of Seaboard's containers were unloaded onto or travelled through confiscated property; nor is there evidence that the Container Terminal was built partly on confiscated land, *supra* Section II.C.1.

### 3. Seaboard did not cause, direct, participate in, or profit from trafficking by a third party.

Plaintiffs also argue that Seaboard caused, directed, participated in, or profited from trafficking by TCM and Taina.  Appellants' Br. 44.  This claim fails for several independent reasons.  First, it is unpreserved.  The district court correctly held that Plaintiffs' Complaint did not allege trafficking through TCM.  D.E. 268 at 34–35; *see also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).  And Plaintiffs did not raise trafficking through Taina to the district court.

Plaintiffs' theory is that Azucarera owned all of the land surrounding the Container Terminal and thus Seaboard's deliveries (chicken and gift parcels) necessarily crossed that land when they left the Container Terminal.

But no evidence supports Plaintiffs' theory.  Plaintiffs' cartography expert did not testify to this point.  He assumed it, relying on what he was "informed by [Plaintiff's] Counsel."  D.E. 178-27, Ex. 2 at 8.  The cartography expert relied on counsel's representation "that the Balsinde Family sold all their land holdings surrounding the Bay of Mariel to the Blanco Rosell family in 1949."  *Id.*  But Plaintiffs offered no evidence supporting this assumption.

38

The uncontroverted evidence showed the opposite: the Balsinde family continued to own property on the Angosta Peninsula (the area of land where the Container Terminal is located) after 1949. In 1959, members of the Balsinde family litigated ownership of an area called "Finca Angosta" on the Angosta Peninsula, D.E. 181-1, Ex. B at 12, confirming that they retained ownership.

Because there is no evidence that Azucarera owned all (or even any specific piece of) the land surrounding the Container Terminal, no evidence supports Plaintiffs' theory that Seaboard's deliveries necessarily traveled over land confiscated from Azucarera.

Nor do Seaboard's contracts with Taina and TCM evidence that those companies trafficked in land confiscated from Azucarera. D.E. 268 at 29–31.

Plaintiffs rely on a single provision in Seaboard's contract with Taina, which obligated Taina "[t]o make seaworthy Equipment available for shippers and to arrange inland haulage according to documents, as required, and according to Shippers instructions as undertaken in the agreement with them." D.E. 199-6 at SEABOARDMARINE_ESI_011233 § 3(b)(iv); Appellants' Br. 44. But there is no evidence regarding whether or how Taina arranged for inland haulage for any shipments by Seaboard, much less that it did so over any confiscated land. The uncontroverted evidence is that the "general duties" listed in the contract included

boilerplate language and that Taina's role was to coordinate the shipments to the container terminal at Mariel.  D.E. 182-8 at 74.

As to TCM, the district court correctly held that the services listed in the appendix of Seaboard's contract with TCM—including the mounting/dismounting of containers from the container yard to truck or rail car, and from truck or rail car to the container yard—would only be provided if requested by Seaboard.  D.E. 268 at 35.  There is no evidence that Seaboard requested them or that TCM provided them.  Plaintiffs contend that those services were necessarily provided because the contract states that "[t]he TERMINAL OPERATOR will provide the CUSTOMER with the Terminal Services included in Appendix I" (Appellants' Br. 46), but Plaintiffs ignore the following clause: "which may be demanded by the CUSTOMER."  D.E. 199-12 at SEABOARDMARINE_ESI_011218 § 2.1.  There is no evidence that Seaboard "demanded"—or TCM provided—any trafficking over confiscated property.

Moreover, the service that Plaintiffs argue involved trafficking— "Mounting/dismounting of Containers from the Container Yard to truck or rail car, and from truck or rail car to the Container Yard" (D.E. 199-12 at SEABOARDMARINE_ESI_011259 § 1(c))—does not demonstrate the use of or benefit from confiscated property.  As the district court held, the Container Yard

40

where Seaboard's containers were stored was not on confiscated property.  D.E. 268 at 25 (citing D.E. 180-3 at 53).[9]

In addition, to prove that Seaboard engaged in "trafficking" by or through TCM or Taina, Plaintiffs would need to show TCM and Taina engaged in "trafficking," 22 U.S.C. § 6023(13)(A)(iii) ("as described in clause (i) or (ii)"), which would require Plaintiffs to prove that TCM or Taina knew that the land was confiscated.  Plaintiffs presented no evidence of TCM's or Taina's knowledge or intent.

> ### 4. Plaintiffs submitted no evidence that Seaboard knowingly and intentionally used or benefitted from confiscated property with respect to confiscated land.

This Court can also affirm the summary judgment because of the absence of evidence of knowledge and intent.  No evidence shows that Seaboard knew and intended that its acts—including its interactions with TCM and Taina—involved confiscated land.

For example, even if Plaintiffs were correct that the TCM office sits on confiscated property, there is no evidence that Seaboard knew that the office sat on confiscated property or knew (or intended) that Seaboard's commercial activities

---

[9] Plaintiffs also argue that TCM operated the Container Terminal and therefore trafficked by "manag[ing] confiscated property."  Appellants' Br. 44.  But there is no evidence of TCM taking any action on land that Azucarera owned, let alone any action in connection with Seaboard transporting chicken and gift parcels to the Container Terminal docks.

benefitted from TCM's office.  There is similarly no evidence that Seaboard knew (or intended) that its containers would be transported across confiscated property.

To the contrary, Seaboard believed, in good faith, that its acts in Cuba did not involve confiscated property.  It verified, including by consulting with outside counsel, that it was lawful to travel to and from Cuba when transporting food and gifts to the Container Terminal.  D.E. 180-3 at 168–69; D.E. 180-1 at 41–42. Seaboard's due diligence confirmed that another company, Crowley, had been shipping to the Container Terminal for five years.  D.E. 183-5 at SEABOARDMARINE_ESI_027727.  And upon receiving a notice letter from Ms. Fernandez, Seaboard confirmed that the Container Terminal (the only property it uses in the Bay of Mariel) was not on confiscated property.  D.E. 180-3 at 169.

As with the Concession, Plaintiffs' failure to present evidence of Seaboard's knowledge provides an alternative ground for affirmance.

\*        \*        \*

The district court thus correctly granted summary judgment in favor of Seaboard on the ground that Plaintiffs presented insufficient evidence for a jury to find that Seaboard trafficked in either the Concession or land confiscated from Azucarera.

### III.  Even if Shareholders Could Theoretically Sue for Confiscations of Corporate Property, Plaintiffs Cannot.

#### A.  The district court correctly held that the heirs and estates cannot assert claims.

To assert a Title III claim for trafficking in property that was confiscated before March 12, 1996, a plaintiff must have "acquire[d] ownership of the claim [to confiscated property] before March 12, 1996."  22 U.S.C. § 6082(a)(4)(B).  Each of the four deceased Blanco Rosell siblings died after 1996.  Appellants' Br. 48; D.E. 45 ¶¶ 17–20 (alleging each deceased sibling "owned his claim to the Confiscated property on March 12, 1996").  The district court correctly dismissed the heirs and estates because they did not acquire ownership of a claim to confiscated property before March 12, 1996.

After Plaintiffs filed their brief, this Court held that an individual who inherits a claim to confiscated property after March 12, 1996, may not bring a Title III claim.  *Garcia-Bengochea*, 2023 WL 142368, at *10.  The same result applies in this case.[10]

*Garcia-Bengochea* also supports dismissal of the estates' claims.  This Court held that "[t]he plain meaning of 'acquires' is '[t]o gain **possession or control** of; to get or obtain."  *Id.* (emphasis added) (quoting *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 336 (5th Cir. 2021)).  Plaintiffs concede that the "[e]states are administered by a

---

[10] Plaintiffs acknowledged that *Garcia-Bengochea* would resolve the claims of the heirs in this appeal.  Appellants' Br. 53–54.

'personal representative,' who takes '**possession or control**' of the 'decedent's property.'" Appellants' Br. 51 (emphasis added) (quoting Fla. Stat. § 733.607(1)). To the extent that claims to confiscated property are assets of the estates, they were "acquired" upon the death of the siblings, after the 1996 cut-off date. The claims of the estates are barred.

Permitting personal representatives of estates to bring claims on behalf of deceased claimholders would undercut the acquisition limitation imposed by Congress and recognized in *Garcia-Bengochea*. Rather than bring claims in their individual capacities, heirs would attempt to circumvent the rule by reopening estates to file Title III claims, as the Plaintiffs did here. *E.g.*, *In re: Estate of Alfredo Blanco, Jr.*, Case No. 2020-005105-CP-02 (Fla. Cir. Ct.) (petition for administration filed December 18, 2020).

Federal law governs whether federal claims survive an individual's death (and can be asserted by an estate), *United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993), and giving effect to Congress's requirement that claims be acquired before 1996 necessarily means that estates cannot be used as vehicles to assert claims that heirs cannot.

Independently, under Florida law, any claims to confiscated property transferred to the heirs upon the siblings' death: "The death of the testator is the event that vests the right to devises unless the testator in the will has provided that

44

some other event must happen before a devise vests." Fla. Stat. § 732.514;[11] *Rice v. Greene*, 941 So. 2d 1230, 1231 (Fla. Dist. Ct. App. 2006) ("it was Mr. Schwartz's death that vested Mrs. Schwartz's rights in the property"); *In re Lonstein*, 950 F.2d 77, 80 (1st Cir. 1991) ("Under Florida law, Lonstein's legal interest in the unrestricted testamentary bequest vested at the time of his mother's death."). Plaintiffs allege that the heirs inherited the deceased siblings' claims to confiscated property, and under Florida law, the heirs acquired those claims at the time of the testators' deaths. D.E. 45 ¶¶ 21–33.

### B. Ms. Fernandez presented insufficient evidence that she was a shareholder in her family corporations.

No admissible evidence shows that Ms. Fernandez owned any portion of either of the two companies at issue.

### 1. Ms. Fernandez testified that she did not know whether she owned stock in any Cuban corporation.

At her deposition, Ms. Fernandez testified, unequivocally, that she knew nothing about Maritima or Azucarera and that she did not recall "ever own[ing] any shares of stock in any Cuban corporation." D.E. 180-5 at 82, 124–125.

---

[11] To the extent that Enrique Rosell and Florentino Rosell died in Puerto Rico, as Plaintiffs alleged (D.E. 45 ¶¶ 19–20), and Puerto Rico law governs the transfer of their purported claims to confiscated property, the same result applies because a personal representative cannot bring a claim on behalf of an estate under Puerto Rico law. *See Arias-Rosado v. Gonzalez Tirado*, 111 F. Supp. 2d 96, 98–99 (D.P.R. 2000) ("the succession does not have existence by itself as a juridical person or entity on behalf of which a lawsuit can be brought").

Recognizing that this testimony foreclosed her claims, Ms. Fernandez's lawyers purported to rewrite her deposition through "errata." For example, counsel purported to change Ms. Fernandez's unequivocal testimony that she had never heard of Azucarera and was not a shareholder of Maritima to "I was an equal owner in the family's businesses with my four brothers." *Compare id.* at 81, 125, *with* D.E. 112, Ex. G-1 at 81:25. Her lawyers offered no acceptable justification for these changes. *See* D.E. 112, Ex. G-1 (asserting, incorrectly, that the reason for the change was to bring the answers "in line with my other testimony and the documents in the case").

These changes violate the principle that "[a] deposition is not a take home examination." *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 (10th Cir. 2002) (quotation omitted). "Rule 30(e) is to be used for corrective, and not contradictory, changes." *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1281 (11th Cir. 2010) (quotation omitted). If it were permissible for counsel to rewrite a party's answers afterward, there would be no point in conducting depositions. These changes should have been struck or, at the least, disregarded at summary judgment. *See id.* (collecting cases).

The same is true of Ms. Fernandez's affidavit (D.E. 222-1): "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with

46

an affidavit that merely contradicts, without explanation, previously given clear testimony." *Malone v. U.S. Att'y Gen.*, 858 F. App'x 296, 300 (11th Cir. 2021) (quoting *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984)).

The district court relied on Ms. Fernandez's testimony that she received an annual gift of $5,000 from her father as supporting an inference that this money was a dividend from her ownership in Maritima and Azucarera. But the inference is untenable—Ms. Fernandez testified that her father also made this gift to her mother (D.E. 180-4 at 49), and it is undisputed that her mother did not own either company (D.E. 180-6 at 5). And even if the gift were a dividend of some type, no evidence connects it to Maritima or Azucarera, as opposed to another company.

### 2. Ms. Fernandez's interrogatory responses do not create a genuine issue of fact.

Ms. Fernandez's deposition testimony also vitiated her interrogatory responses. She testified that she did not read the interrogatory responses before signing the verification. D.E. 180-5 at 177.[12] And the "verification" states that the responses are based on an "investigation undertaken on [Ms. Fernandez's] behalf."

---

[12] Ms. Fernandez testified that she did not read the interrogatory responses because she did not realize she was supposed to. D.E. 180-5 at 177. Her counsel submitted contradictory errata purporting to testify that they were read to her. D.E. 112 at 177:6-7, 18. As with counsel's other changes to their client's testimony, it should be disregarded.

D.E. 180-6 at 17.  Plaintiffs' counsel explained that they treated the interrogatories as contention interrogatories, which asked for legal theories and not for Ms. Fernandez's personal knowledge.  D.E. 197 at 6; D.E. 108 at 13.

Because the interrogatory responses were not based on Ms. Fernandez's personal knowledge, they could not be considered at the summary judgment stage. *McFaul v. Valenzuela*, 684 F.3d 564, 580 (5th Cir. 2012).

### 3.    No documents supported Ms. Fernandez.

No document creates a genuine issue of fact regarding Mrs. Fernandez's ownership.

*Property Owners of Cuba 1958* discusses her brother, Alfredo Blanco Rossel, Jr., and states only that "[h]is siblings, Enrique, Florentino, and Adelfa, were shareholders in the family properties."  D.E. 108-2 at 3.  Odette Fernandez is not identified as an owner of "the family properties," let alone Azucarera or Maritime.

*The History of Mariel* identifies her three brothers as "landowner[s]" but describes Ms. Fernandez only as the wife of Johnny Fernandez Manzini.  D.E. 108-3 at 2.  The book references "Maritima de Mariel S.A." only to note that the "Blanco family" constructed piers under the company name.  *Id.*

*The Annual Report of Cuban National Finance Corp. (1956-1957)* discusses business ventures of Ms. Fernandez's father, Alfredo Blanco Calas, but makes no reference to Ms. Fernandez.  D.E. 108-4.

*Cuban Government Resolution No. 436* identifies companies that either members of the Blanco Rosell family or "third parties" owned and does not specify which individuals owned any particular companies, including Maritima or Azucarera. *Id.* at 4.

*Businesses of Cuba 1958* discusses ownership of other companies but not Maritima or Azucarera. D.E. 198-8 at Plf.000552.

Various communications from Ms. Fernandez's brother do not mention Maritima, Azucarera, or Ms. Fernandez. D.E. 199-8, 199-14. The letter also omits Maritima and Azucarera from the list of "family assets." D.E. 199-14 at Plf.006243.

### 4.    No other admissible testimony supports Ms. Fernandez.

Ms. Fernandez also attempted to rely on testimony from Liana Blanco and Emma Blanco that they were told years ago that Ms. Fernandez and her siblings owned companies in Cuba. D.E. 179-9 at 35, 36; D.E. 179-8 at 31–32. Because this hearsay testimony could not be presented in an admissible form at trial, it could not be considered at summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1325 (11th Cir. 1999).

No admissible evidence would permit a reasonable factfinder to find that Ms. Fernandez owned a portion of the companies at issue. This Court can affirm the summary judgment against her on this basis.

49

**IV.    The Uncontroverted Evidence Shows that Seaboard's Activities Were Necessary to the Lawful Travel of Goods to Cuba.**

Under the Helms-Burton Act, "traffics" does not include "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel."  22 U.S.C. § 6023(13)(B)(iii).  This provision "remove[s] any liability for . . . any activities related to lawful travel to Cuba." H.R. Rep. No. 104-468, 1996 WL 90487, at H1656 (1996).

This Court need not determine which party bears the burden because the uncontroverted facts demonstrate that Seaboard's use of the Container Terminal was necessary to the lawful travel of goods.  *See* D.E. 177-1 ¶¶ 63–90.  This Court can affirm the summary judgment on this ground.

**A.    "Lawful travel" includes the travel of goods and vessels.**

"Lawful travel" includes travel of goods and vessels and is not limited to travel by people.  Nothing in the text of the statute limits "lawful travel" to travel by persons, and the ordinary meaning of "travel" includes the travel of goods and vessels.  *See* Travel, Merriam-Webster Dictionary (noting "goods traveling"), https://www.merriam-webster.com/dictionary/travel (last visited Jan. 29, 2023).

In other statutes, Congress regularly uses "travel" to refer to the movement of goods[13] and movement of vessels.[14] Courts also routinely refer to the "travel" of goods[15] and vessels.[16]

When Congress meant for the Helms-Burton Act to refer to "travel" by individuals, the statute's text did so expressly. *See, e.g.*, 22 U.S.C. § 6042(2) ("travel to Cuba by individuals"); *id.* § 6062(b)(2)(A)(iii) ("freedom of individuals to travel"). If "travel" inherently referred only to travel by individuals, these qualifiers would be unnecessary. The lawful travel exception includes "lawful travel to Cuba" of goods and vessels—not merely "travel to Cuba by individuals."

---

[13] *See* 49 U.S.C. § 70101(b)(7) ("goods that . . . travel"); 18 U.S.C. § 116(d)(5) ("instrument, item, substance, or other object that has traveled"); 34 U.S.C. § 30501(6)(E) ("articles that have traveled"); 6 U.S.C. § 1201(d)(2)(B) ("shipment traveling"); 42 U.S.C. § 300h-7(e) ("travel of various contaminants").

[14] *See* 46 U.S.C. § 70304(a) ("passenger vessels . . . traveling"); 49 U.S.C. § 44908(a) ("aircraft . . . traveling"); 49 U.S.C. § 70202(b)(6) ("travel by heavy vehicles").

[15] *E.g.*, *Bissonnette v. LePage Bakeries Park St., LLC*, 33 F.4th 650, 657 (2d Cir. 2022) ("goods that travel"); *United States v. Burning Breast*, 8 F.4th 808, 813 (8th Cir. 2021) ("completed rifle . . . traveled"); *United States v. Vargas*, 6 F.4th 616, 623 (5th Cir. 2021) ("goods to travel"); *United States v. Pierre-Louis*, 860 F. App'x 625, 632 (11th Cir. 2021) ("firearm traveled"); *United States v. Folk*, 754 F.3d 905, 915 (11th Cir. 2014) (same); *United States v. Needham*, 604 F.3d 673, 680 (2d Cir. 2010) ("narcotics . . . travel"); *Jessica Howard Ltd. v. Norfolk S. R.R. Co.*, 316 F.3d 165, 166 (2d Cir. 2003) ("goods traveled").

[16] *E.g.*, *United States v. Wiggins*, 784 F. App'x 919, 926 (6th Cir. 2019) ("vehicle's travel"); *United States v. Alfaro Moncada*, 607 F.3d 720, 723 (11th Cir. 2010) ("ship . . . traveling").

**B.      Seaboard's activities were lawful.**

The travel of goods and vessels at issue was lawful.  Congress expressly permitted the export of "agricultural commodities" and "[g]ift parcels and humanitarian donations" to Cuba.  15 C.F.R. § 746.2(a)(1).  The uncontroverted evidence demonstrates that the travel of chicken and gift parcels to Cuba facilitated by Seaboard was lawful under these rules.

The travel of chicken was lawful under License Exception AGR.  Frozen chicken is an agricultural commodity.  *Id.* § 740.18(a)(1); D.E. 177-1 ¶ 65.  Agricultural commodities are classified as EAR 99.  15 C.F.R. § 740.18(a)(2); D.E. 177-1 ¶ 66.  Exports of frozen chicken were each made pursuant to written contracts between the shipper (Boston Agrex) and the customer (Empresa Comercializadora de Alimentos).  15 C.F.R. § 740.18(a)(3); D.E. 177-1 ¶ 67.  The exports occurred within 12 months of the signing of the contracts.  15 C.F.R. § 740.18(a)(4); D.E. 177-1 ¶ 68.  And notice of each export was sent to and validated by the Bureau of Industry and Security.  15 C.F.R. § 740.18(a)(5); D.E. 177-1 ¶ 69.

The travel of gift parcels was lawful under License Exception GFT.  *See* 15 C.F.R. §§ 740.12, 746.2(a)(1)(viii); D.E. 177-1 ¶ 74.  The two shippers of gift parcels (Mayabe Express, Corp. and Aparicio Cargo & Travel Service) agreed by contract with Seaboard that the items would meet those requirements and certified

52

that the items met those requirements.  D.E. 177-1 ¶¶ 76–85.  Records confirm that the gift parcels consisted of only eligible items.  *Id.* ¶¶ 78, 83.

Finally, the movement by the vessels to and from the Container Terminal was lawful under EAR License Exception AVS.  15 C.F.R. § 740.15.  A foreign flagged vessel, such as Seaboard's (D.E. 182-11 ¶ 2), "may depart from the United States under its own power for any destination, provided that:" (1) no sale or transfer of operations control of the vessel to a national of certain countries occurred while in the United States; (2) the vessel is not departing for the purpose of sale or transfer of operational control to a national of certain countries; and (3) the vessel does not carry from the United States any item for which a license is required and has not been granted by the U.S. Government.  15 C.F.R. § 740.15(d)(1).  Each requirement was met by Seaboard's transports to the Container Terminal.  D.E. 182-11 ¶¶ 3–6.

## C. Seaboard's use of the Container Terminal was necessary to the lawful travel of the chickens and gift parcels.

Seaboard's use of the Container Terminal was "necessary" to the lawful travel of these goods because it was a reasonable means.  "Necessary" does not mean having no alternative, but even if it did, Seaboard's use of the Container Terminal would qualify.

53

### 1.  Seaboard's use of the Container Terminal was "necessary" to lawful travel because it was reasonable and appropriate.

This Court has held that "necessary" is governed by a "test of reasonableness, not of absolute necessity." *Inbesa Am., Inc. v. M/V Anglia*, 134 F.3d 1035, 1036 (11th Cir. 1998) (quotation omitted); *see also Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018) (holding that "necessary" "may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought" (quoting Black's Law Dictionary 928 (5th ed. 1979)); *McCulloch v. Maryland*, 17 U.S. 316, 413 (1819) ("convenient, or useful, or essential" to the end). Innumerable cases have followed this understanding. *E.g.*, *Fish v. Kobach*, 840 F.3d 710, 734 (10th Cir. 2016) ("courts also have frequently interpreted 'necessary' to mean something less than absolute necessity").

Plaintiffs have never denied that using the Container Terminal was a reasonable and appropriate means of exporting chickens and gift parcels to Cuba. Under the Helms-Burton Act, it was thus "necessary to the conduct" of lawful travel of these goods to Cuba.

### 2.  Even under a narrower definition, Seaboard's use of the Container Terminal was "necessary."

Even if "necessary" meant "required," Seaboard's use of the Container Terminal would still be necessary.

The Container Terminal is the only maritime facility in Cuba with the infrastructure to receive shipping containers, "the main agents of the modern international transport system." D.E. 177-1 ¶ 51. With limited exceptions, goods must be shipped in containers, and frozen chicken must be shipped in refrigerated containers. *Id.* ¶ 53. Special infrastructure is necessary to receive these deliveries, and since 2013, "the only port [in Cuba] that has the infrastructure for container ships is Terminal de Contenedores Mariel." *Id.* ¶¶ 54, 56. Even if "necessary" mean "required," Seaboard's use of the Container Terminal was "necessary" to lawful travel.

## V.    Plaintiffs Failed to Present Evidence of Damages Attributable to the Alleged Trafficking.

Summary judgment was also proper because Plaintiffs failed to present adequate evidence of damages. *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1234 (11th Cir. 2009). "[A] plaintiff's damages case must be consistent with its liability case[.]" *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (quotation omitted). When a plaintiff presents insufficient evidence of damages, summary judgment is proper. *In re Deepwater Horizon*, 48 F.4th 378, 387 (5th Cir. 2022).

For Title III claims, a plaintiff may recover "the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater." 22 U.S.C.

§ 6082(a)(1)(A)(i)(III). "That property" refers to the property that was "confiscated by the Cuban Government" and "traffic[ked] in" by the defendant. *Id.* § 6082(a)(1)(A).

To avoid summary judgment, Plaintiffs had to present competent evidence of the current fair market value of the confiscated property that Seaboard allegedly trafficked in.

In their brief, Plaintiffs assert that Seaboard trafficked in: (1) land upon which portions of the Container Terminal rest, specifically the location of the TCM office; (2) unidentified land outside the Container Terminal that Plaintiffs speculate was used to transport containers; and (3) an exclusive right to exploit port facilities in the Bay of Mariel. Appellants' Br. 21, 32, 40, 45.

Plaintiffs failed to present evidence of the current fair market value of these properties. Plaintiffs' damages experts instead purported to value vast amounts of property—including thousands of acres and intangible rights (for decades in the future) not involved in any alleged trafficking—at up to $5 billion. Their damages case is not consistent with their liability theory, and they present no evidence under the proper measure.

### A. Plaintiffs' expert erroneously valued nearly 1,400 acres owned by Azucarera, not the land allegedly trafficked in.

Plaintiffs' expert Lori Wolin erroneously attempted to measure the current fair market value of approximately 1,385 acres of land, including a mangrove forest and

some warehouse space.  D.E. 183-8 ¶ 33.  Wolin valued that property between $635 million and $4.1 billion based on the sales prices of properties near ports in Florida over the past 25 years (a facially irrational yardstick).[17]

But Plaintiffs do not allege that Seaboard trafficked (under any definition) in *all* of those 1,385 acres.  Plaintiffs allege that Seaboard trafficked, at most, in small pieces of land on which the TCM office sits and over which containers traveled.  Plaintiffs never measured—and never valued—this small amount of land.

Because Plaintiffs presented no evidence of the value of the land allegedly trafficked in, summary judgment was warranted.

### B.    Plaintiffs' expert erroneously valued the projected profits from operating a Container Terminal for decades, rather than the rights allegedly trafficked in.

Plaintiffs commit the same error with the Container Terminal.  Their expert, Jose Alberro, purported to measure "the value of the concession to operate the container terminal of the Port of Mariel."  D.E. 183-10 ¶ 14.  He calculated the right to operate the Container Terminal over a 30-year period at nearly $800 million.  D.E. 183-14 ¶ 5.

But Plaintiffs do not allege that Seaboard trafficked in the exclusive right to operate a port for thirty years.  Even if, by delivering goods to a port, Seaboard

---

[17] After her deposition, Wolin submitted an untimely "supplemental report" in which she changed her valuation to $1.4 billion.  D.E. 201-12.

somehow "trafficked" in the exclusive right to operate that port, then the relevant "property" trafficked in would be the right to operate the port during those deliveries, not the right to operate the port for decades in the future. Plaintiffs presented no evidence of the fair market value of the right to operate the Container Terminal in which Seaboard allegedly trafficked (i.e., the right to operate the port when Seaboard delivered its chickens and gift parcels).

If Plaintiffs could recover the value of operating the Container Terminal for 30 years from any company that made a single delivery, then the statute would be unconstitutional or, at least, raise serious constitutional concerns. The damages sought from Seaboard would be "so severe and oppressive as to be wholly disproportioned to the offense." *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66–67 (1919). The Eighth Circuit has recognized that $1.6 billion—far, far less than Plaintiffs seek—is a "shockingly large amount" that "violate[s] the Due Process Clause." *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 962 (8th Cir. 2019).

Moreover, the recovery would be the same, regardless of the defendant's conduct. In Plaintiffs' view, the statute imposes identical liability on (1) a company that takes over and operates the Container Terminal for 30 years; (2) a company that delivers daily to the Container Terminal for 30 years; and (3) a company that makes a single delivery to the Container Terminal. Such a result violates due process. *See Superior Laundry Co. v. Rose*, 137 N.E. 761, 762 (Ind. 1923) (rejecting a penalty

58

that was "not proportioned to the amount of wages withheld" but added on the original amount owed every 10 days).

The serious constitutional doubts raised by Plaintiffs' interpretation confirm the statute's plain text. *See Clark v. Martinez*, 543 U.S. 371, 380–81 (2005). Plaintiffs could recover only the value of what Seaboard allegedly trafficked in (the right to operate the Container Terminal at the time of Seaboard's deliveries), not the value of operating the Container Terminal for 30 years.

Because Plaintiffs failed to present any evidence of the value of the rights allegedly trafficked in by Seaboard, summary judgment was proper.

## CONCLUSION & PRAYER FOR RELIEF

For these reasons, the judgment should be affirmed.

Dated:  January 30, 2023

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:    /s/ *William R. Peterson*
      William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002

      Robert M. Brochin
      Matthew Papkin
600 Brickell Ave., Ste. 1600
Miami, FL 33131

      Brian A. Herman
101 Park Ave.
New York, NY 10178

      Amanda L. Salz
1111 Pennsylvania Ave., NW
Washington, DC 20004

***Counsel for Appellee, Seaboard Marine Ltd.***

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, this document contains 12,916 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


*/s/ William R. Peterson*
William R. Peterson
*Counsel for Appellee,*
*Seaboard Marine Ltd.*

Dated: January 30, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2023, I electronically filed the Redacted Brief of Appellee with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Further, I hereby certify that I filed four paper copies of the Sealed Brief of Appellee with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by FedEx. I certify that on January 30, 2023, I have emailed a courtesy copy of the Sealed Brief of Appellee to counsel for Appellants at esokoloff@mololamken.com. Further, I will mail the Sealed Brief of Appellee by First-Class Mail, postage prepaid, or will dispatch it to a third-party commercial carrier for delivery within 3 calendar days, to the following participants:

Eugene A. Sokoloff
 *Counsel of Record*
Kenneth E. Notter III
MOLOLAMKEN LLP
300 N. LaSalle Street
Chicago, IL 60654
(312) 639-8410
esokoloff@mololamken.com

Laina C. Lopez
Dale B. Eppler
Jared R. Butcher
BERLINER CORCORAN & ROWE, LLP
1101 17th Street, N.W., Ste. 1100
Washington, D.C. 20036
(202) 293-9096

David A. Baron
Melvin White
BERLINER CORCORAN & ROWE, LLP
1101 17th Street, N.W., Ste. 1100
Washington, D.C. 20036
(202) 293-1074

Martin Cunniff
FIELDS PLLC
1701 Pennsylvania Ave, N.W.,
Ste. 200
Washington, D.C. 20006
(833) 382-9816

John S. Gaebe
LAW OFFICES OF JOHN S. GAEBE P.A.
5870 SW 96 St.
Miami, Florida 33156
(305) 607-4755

William R. Boeringer
William B. Milliken
HORR, NOVAK & SKIPP, P.A.
Two Datran Center, Ste. 1700
9130 S. Dadeland Boulevard
Miami, Florida 33156
(305) 670-2525

*Counsel for Appellants*

/s/ William R. Peterson
William R. Peterson
*Counsel for Appellee,*
*Seaboard Marine Ltd.*

Dated: January 30, 2023